**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Ryan McDermott, being duly sworn, hereby depose and state:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a police officer employed by the Nashua Police Department in New

Hampshire ("Nashua PD"), and a deputized Task Force Officer ("TFO") with the United States

Drug Enforcement Administration's ("DEA") Manchester District Office ("MDO") in New

Hampshire.  I am the case officer with primary responsibility over the investigation herein

described.  I have direct and indirect knowledge of the following information.

2.      As a DEA TFO, I am authorized to perform federal law enforcement functions

outlined in 21 U.S.C. § 878(a), pursuant to cooperative enforcement arrangements authorized by

21 U.S.C. § 873(a)(7), including the execution and service of search warrants issued under the

authority of the United States, which encompass the investigation of federal drug and money

laundering violations under Title 21 and Title 18 of the United States Code.  As described later, I

am engaged in the enforcement of federal criminal law, and, thus, I am a "Federal law

enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(c) also authorized to apply

for the requested search warrant.

3.      I have been a full-time certified police officer in New Hampshire since 2011 and

currently serve as a Nashua PD Detective.  I have also served as a DEA TFO since July 2023.  I

have completed several trainings related to narcotics and criminal interdiction hosted by various

entities, including the DEA, and have participated in numerous narcotics investigations.

4.      My drug investigation and enforcement experiences are varied.  I have

participated in various aspects of drug investigations, including surveillance.  I have participated

in the execution of search warrants resulting in the seizure of controlled substances and

1

paraphernalia used to manufacture and distribute controlled substances; United States Currency; records of narcotics and monetary transactions; drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances; and the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have also participated in the execution of arrest warrants for drug violations, the debriefing of defendants, informants, and witnesses with personal knowledge of drug trafficking organizations ("DTOs").

5.      Through my training and experience, I have gained a nuanced understanding of criminal drug distribution activity. I have become familiar with the way that DTOs conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement. Based on my training and experience, I am familiar with the various methods of operation employed by narcotics traffickers to further their illicit operations.

6.      I have consulted various sources of information to support my statements in this affidavit. These statements are based on my participation in this investigation, as well as information I consider reliable from the following sources: my experience investigating drug trafficking offenses; oral and written reports and documents about this investigation that I have received from members of federal, state, and/or local law enforcement agencies; discussions that I have had concerning this investigation with other experienced narcotics investigators; physical and visual surveillance conducted by federal, state, and/or local law enforcement agencies, the results of which have been reported to me either directly or indirectly; public records and law enforcement databases; among other sources.

7.    This affidavit distinguishes between my direct and indirect knowledge of the matters asserted.  Unless otherwise indicated, the statements contained herein are summaries of information that I have received from other law enforcement officers, and I specifically relied on oral reports from other law enforcement officers. When information is based on my personal knowledge or conclusion, it will be so stated.

8.    This affidavit is not an exhaustive or comprehensive account of information gathered during the investigation. As this affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of the requested warrant, I have not included every detail of every aspect of the investigation that is known to me.  That said, this affidavit does contain all the material information known to me that is pertinent to the requested search warrant(s), but it does not set forth all my knowledge about this matter.

## **PURPOSE OF AFFIDAVIT**

9.    This affidavit is made in support of applications for search warrants, authorizing the search of the following:

a.    The premises at ███████████, Apartment 7, Nashua, New Hampshire, which is particularly described in Attachment A-1 ("TARGET APARTMENT 1");

b.    The premises at ███████████, Apartment 16, Nashua, New Hampshire, which is particularly described in Attachment A-2 ("TARGET APARTMENT 2");

c.    The premises at 13 ½ Merrill Street, Nashua, New Hampshire, which is particularly described in Attachment A-3 ("TARGET APARTMENT 3");

d.    The person of ELIZARDO ESCARIA DELISON, who is identified by date of birth and photograph in Attachment A-4;

3

e.    The person of BELISARIO LUIS DELISON, who is identified by date of birth and photograph in Attachment A-5;

f.    The person of RAYDDY DELISON DE AZA, who is identified by date of birth and photograph in Attachment A-6; and

g.    The person of MARIO ALEXANDER DE JESUS CASTILLO, who is identified by date of birth and photograph in Attachment A-7.

10.    Based on my training and experience, I submit that the facts contained in this affidavit establish probable cause to believe that ELIZARDO ESCARIA DELISON ("DELISON"), BELISARIO LUIS DELISON ("BELISARIO"), RAYDDY DELISON DE AZA ("RAYDDY"), JUAN GABRIEL NOVA RUIZ ("NOVA RUIZ"), GEORGE LUIS MARCIAL ("MARCIAL"), and MARIO ALEXANDER DE JESUS CASTILLO ("DE JESUS CASTILLO"), have committed violations of 21 U.S.C. § 841 (distribution and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and that contraband and evidence, fruits and instrumentalities of these violations will be found in the target premises and on the individuals herein described.

## LOCATIONS AND PERSONS TO BE SEARCHED

11.    I refer the Court to Attachments A-1 through A-7, as applicable, which are incorporated herein by reference.

## PROPERTY TO BE SEIZED

12.    I refer the Court to Attachments B-1 through B-7, as applicable, which are incorporated herein by reference.

## STATEMENT OF PROBABLE CAUSE

4

***Statements from a source of information regarding DELISON,
his use of a "Luis Perez" identity and involvement in criminal activities***

13.    On March 4, 2022, Nashua PD Officer Josue Santiago ("Officer Santiago") met with a source of information ("SOI"), who wished to provide information about a male subject involved in an alleged criminal organization based in the Dominican Republic.  The SOI reported that the male subject, with whom the SOI was reportedly familiar, lived in Nashua, New Hampshire, under the false identity of "Luis Perez Tomassini."  The SOI reported that another person by the name of "Luis Perez Tomassini" was previously deported from the United States, which raised the officer's suspicions about the male subject's reported use of that identity. The SOI reported that the male subject was able to enter the United States illegally, via the island of Saint Croix in the Virgin Islands, and was staying at 171 Main Street, Apartment 1, in Nashua, New Hampshire.  The SOI reported that the organization was involved in serious criminal activities, including drug trafficking.  The SOI reported that the organization had a connection to the Philadelphia, Pennsylvania, Department of Motor Vehicles, and could obtain driver's licenses for individuals otherwise unable to get them.  The SOI also reported that the male subject, DELISON, made trips to Pennsylvania to bring drugs into New Hampshire.  The SOI believed that the male subject used a New York-based phone number ending in 1124 ("the 1124 Phone") and WhatsApp.

14.    To support their statements, the SOI provided photographs of two photo identification cards ("photo IDs"), one issued in Massachusetts and the other in Pennsylvania. Upon inspection, Officer Santiago noticed that both photo IDs showed the same name "Luis Perez Tomassini" and contained the same identifying information, including date of birth. However, the photo IDs showed two different individuals.  The Pennsylvania photo ID showed a male subject, who was subsequently identified as ELIZARDO ESCARIA DELISON during this

investigation ("DELISON"), and the Massachusetts photo ID showed a different individual. Further, Officer Santiago later discovered that the male subject shown in the Pennsylvania photo ID also had obtained a New Hampshire driver's license with the name "Luis Perez Tomassini" and related identifying information.

15.     In furtherance of the investigation, beginning around May 2022, Nashua PD narcotics detectives began conducting surveillance in the area of 171 Main Street in Nashua, New Hampshire.  During this time, in and around May 2022, detectives observed a silver 2009 Honda Civic (the "silver 2009 Civic"), driven by an individual who was subsequently determined to be DELISON during this investigation.  However, at the time when these events were occurring, the 2009 Civic was registered to a "Luis Perez Tomassini."  DELISON was observed making frequent quick stops around Nashua and Hudson, New Hampshire, which I know based on my training and experience, is consistent with street-level narcotic transactions. Detectives also noted that DELISON seemed hyperaware of his surroundings and used suspected counter-surveillance tactics.  These included often changing his speeds drastically, checking his mirrors for vehicles around him, stopping on the sides of roads to let vehicles pass him and make random stops at public locations without exiting the vehicle.  Additionally, DELISON would take rather in-direct routes to travel from one destination to the other. These observations raised suspicions about DELISON's possible involvement in criminal activities, consistent with the information provided by the SOI.  As a result, law enforcement continued the investigation.

***Statements from a cooperating defendant
regarding the 1124 Phone used by DELISON
and his reported involvement in cocaine distribution***

16.     On February 1, 2023, I reviewed a report completed by DEA Special Agent ("SA") Jeremy Smith referencing information about a "Luis Perez Tomassini."  This information

was provided by a cooperating defendant ("CD"), who was known to associate with "Luis Perez Tomassini." The CD reported that the individual referred to as "Luis Perez Tomassini" in the report was a crack cocaine distributor operating in the Nashua, New Hampshire, area. The CD advised that the individual lived in an apartment on Main Street in Nashua and purchased cocaine by the kilogram in Massachusetts. The CD advised that the individual would purchase the kilogram for approximately $27,000 and bring it back to Nashua for distribution over the next two to three weeks. The CD advised that the individual had a microwave in his apartment, which had an electronic hide within it. The CD also identified the 1124 Phone as being used by the individual but advised that the individual used at least two cell phones and used WhatsApp. The information provided by the CD was consistent with information provided by the SOI, particularly regarding the 1124 Phone and its connection to "Luis Perez Tomassini" who was subsequently determined to be DELISON during this investigation. It should be noted that the CD had been seen in Nashua with DELISON by members of the Nashua Police Department prior to CD's incarceration.

***Statements from a Cooperating Source regarding a "Luis Perez"***
***and his reported involvement in crack cocaine distribution***

17.     On October 10, 2023, Nashua PD Detective Jowders met with a Nashua PD cooperating source ("CS-1") in reference to drug activity in Nashua, New Hampshire. CS-1 reported that a "Luis Perez" used a Massachusetts-based phone number ending in 9084 ("the 9084 Phone"), sold crack cocaine in Nashua, and operated a black Honda Civic. CS-1 had purchased narcotics from "Luis Perez" in the recent past. CS-1 described "Luis Perez" as a Hispanic male with short dark hair and average height. Based partly on the name and physical description provided, which was consistent with information provided by the SOI, Detective Jowders believed that "Luis Perez" was DELISON. Furthermore, CS-1 advised that "Luis

Perez" worked with "Luis Perez's" cousin and uncle. CS-1 described the cousin as being a
darker skin male in his twenties with braids in his hair. CS-1 described the uncle as being older
than "Luis Perez" but having very similar facial features.

***Statements from a second Cooperating Source regarding the 9084 Phone reportedly used by a
"Cache Perez," believed to be DELISON,
in connection with crack cocaine distribution***

18.     On November 2, 2023, I met with a different Nashua PD cooperating source
("CS-2") in reference to drug activity in Nashua, New Hampshire. CS-2 advised that they had
been purchasing crack cocaine from a male subject named "Cache Perez" utilizing the 9084
Phone. CS-2 described "Cache Perez" as a Hispanic male around 30 years old, clean cut with
short dark hair. Furthermore, CS-2 advised that "Cache Perez" had two vehicles registered to
him, one which was a light color and a second, darker colored vehicle. CS-2 reported that
"Cache Perez" also sells crack with his cousin, who is a younger Hispanic male in his 20s, with
longer hair possibly in dreadlocks. CS-2 was confident that "Cache Perez" was in charge of the
operation. Based partly on the name, description, and identification of the 9084 Phone,
consistent with the information provided by CS-1, "Cache Perez" was confirmed to be
DELISON.

19.     To advance the investigation, law enforcement secured assistance and cooperation
from CS-2. I know that CS-2 has a criminal history in New Hampshire which consists of
arrests/charges for suspension of vehicle registrations, on or about November 2, 2023,
Possession of a Controlled Drug and Falsifying physical evidence charges, on or about May 9,
2018, Possession of a Controlled Drug, on or about April 7, 2021, as well as Possession of a
Controlled Drug, on or about April 9, 2024. The narcotics cases listed have been dismissed or
nol-prossed with no convictions on CS-2's criminal record. I know that CS-2 has admitted to

past involvement in drug use and/or distribution. I also know that CS-2 is cooperating with law enforcement in exchange for possible consideration or leniency in a pending New Hampshire state felony drug case against CS-2. CS-2 has not been given monetary compensation by investigators in this case.

20.    Notwithstanding these disclosures, I find CS-2's information regarding narcotics distribution to be credible and reliable for several reasons. First, CS-2 has a basis of knowledge of the drug activities under investigation and is familiar with "Perez" based on past interactions. Given CS-2's involvement in prior drug use and/or distribution, CS-2 knows what narcotics look like and how they are packaged for distribution and distributed, and knows the jargon associated with drug distribution, the various drug types and quantities, and the prices typically charged for narcotics. CS-2 has personally known "Perez" for some time and bought narcotics from him and his associates. Second, the identity and contact information of CS-2, including their first and last names, active telephone number, and current address, are known to me and other law enforcement agents involved in this investigation. Third, I have been able to independently corroborate material aspects of the information provided by CS-2 during this investigation. At the direction and under the supervision of law enforcement, CS-2 has conducted controlled purchases of narcotics, which provided evidence of drug distribution consistent with information obtained by law enforcement through other investigative means. Fourth, CS-2 has also provided information in other drug investigations. These investigations involved CS-2 conducting controlled purchases and providing information on drug trafficking organizations. CS-2 has cooperated in both state and federal narcotics investigations, both of which have resulted in arrests and convictions.

*November 14, 2023 Nashua PD road stop of*
*black 2009 Honda Civic registered to "Luis Perez"*

**and driven by RAYDDY**

21.    On November 14, 2023, Nashua PD Officer Eric Walker conducted a motor vehicle stop of a black 2009 Honda Civic (the "black 2009 Civic") for an expired inspection sticker.  The black 2009 Civic was registered to a "Luis Perez Tomassini."  The operator of the vehicle resembled "Luis Perez's" cousin, as described by CS-2.  The operator was a younger Hispanic male in his 20s, with longer dark hair.  The operator was positively identified as RAYDDY DELISON DE AZA ("RAYDDY") via a Dominican Republic driver's license.

***November 16, 2023 CS-2 controlled purchase of crack cocaine from DELISON***

22.    On November 16, 2023, Nashua PD Detective Michael Zupkosky met with CS-2 to conduct a controlled purchase of crack cocaine from the male subject known to CS-2 as "Cache Perez," believed to be DELISON.  To that end, CS-2 arranged a purchase of crack cocaine from "Cache Perez" via phone call to the 9084 Phone and in the presence of Detective Zupkosky.  CS-2 was subject to standard checks before and after the purchase and equipped with an audio-video recording device.  At approximately 4:38 P.M., CS-2 met with "Perez" in a parking lot in Nashua, New Hampshire, and gave "Perez" pre-recorded U.S. Currency in exchange for crack cocaine.  "Perez" arrived by himself in the black 2009 Civic.  This transaction was monitored by numerous members of the Nashua PD's Narcotics Intelligence Division ("NID").  The suspected narcotics were later tested at the State of New Hampshire Forensic Laboratory yielding a positive result of 1.26 grams of crack cocaine.  Detective Zupkosky confirmed that DELISON was the male in the black 2009 Civic who conducted the drug sale to CS-2 after he reviewed the audio-video recording.

23.    DELISON was alone for the transaction in the vehicle and surveillance units observed him conduct extensive counter surveillance after leaving the parking lot of the deal

location in Nashua. For example, DELISON conducted numerous U-turns, stopped in random parking lots without exiting the car or meeting with anyone, and drove down short side streets with one way in and one way out. Based on my training and experience and the experience of other investigators involved in this investigation are indicative of counter surveillance tactics commonly used by members of DTOs attempting to detect the presence of law enforcement and surveillance.

***November 27, 2023 UC-1 controlled purchase of crack cocaine from DELISON***

24.    On November 27, 2023, Detective Zupkosky contacted the 9084 Phone via phone call in an attempt to conduct an undercover purchase of crack cocaine from DELISON. Detective Zupkosky ("UC-1"), acting in an undercover capacity, ultimately met with DELISON in Nashua, New Hampshire, and purchased a quantity crack cocaine from DELISON with pre-recorded U.S. Currency. UC-1 was equipped with an audio-video recording device for this meeting. This controlled purchase took place in the area of Wendy's restaurant on East Hollis Street in Nashua, New Hampshire, in a public parking lot and was monitored by numerous other NID Detectives. DELISON arrived alone to the deal in the black 2009 Civic. The suspected narcotics were later tested at the State of New Hampshire Forensic laboratory yielding a positive result of 3.211 grams of crack cocaine.

***Homeland Security Investigations' positive identifications of DELISON and RAYDDY***

25.    In December 2023, I spoke with Homeland Security Investigations ("HSI") SA Adam Rayho in reference to DELISON. SA Rayho was able to confirm that ELIZARDO ESCARIA DELISON was from the Dominican Republic. This was done by utilizing the information gathered from this investigation and facial recognition technology from DELISON's documents from the Dominican Republic. Furthermore, SA Rayho was able to observe that

RAYDDY DELISON DE AZA appeared to be a correct identification of the male stopped by Officer Walker on November 14, 2023. RAYDDY's documents were reviewed which showed his father to be a BELISARIO LUIS DELISON ("BELISARIO").

***January 30, 2024 CS-3 controlled purchase of crack cocaine from RAYDDY***

26.     On January 30, 2024, Detective Zupkosky met with a third Nashua PD cooperating source ("CS-3") in reference to an individual known to CS-3 as "Papi." The purpose of the meeting was to conduct a controlled purchase of crack cocaine from "Papi," believed to be RAYDDY.

27.     I know that CS-3 has a criminal history in New Hampshire and Texas, which consists of arrests/charges for Forgery and Theft related offenses, on or about October 8, 2014, Possession of Marijuana, on or about September 11, 2015, Sale of a Controlled Drug on or about January 10, 2023, as well Possession of a Controlled drug, on or about January 31, 2023. These particular narcotics charges were nol-prossed. I know that CS-3 has admitted to past involvement in drug use and/or distribution. I also know that CS-3 cooperated with law enforcement in exchange for possible consideration or leniency in a New Hampshire state felony drug case against CS-3 that was pending at the time CS-3 gave information to law enforcement. CS-3 was not given monetary compensation by investigators in this case.

28.     Notwithstanding these disclosures, I find CS-3's information regarding narcotics distribution to be credible and reliable for several reasons. First, CS-3 has a basis of knowledge of the drug activities under investigation and is familiar with "Papi" based on past interactions. Given CS-3's involvement in prior drug use and/or distribution, CS-3 knows what narcotics look like and how they are packaged for distribution and distributed, and knows the jargon associated with drug distribution, the various drug types and quantities, and the prices typically charged for

narcotics. CS-3 is familiar with "Papi" from past communications and interactions with him. CS-3 had purchased drugs from "Papi" in the recent past. Second, the identity and contact information of CS-3, including their first and last names, active telephone number, and current address, are known to me and other law enforcement agents involved in this investigation. Third, I have been able to independently corroborate material aspects of the information provided by CS-3 during this investigation. At the direction and under the supervision of law enforcement, CS-3 has conducted controlled purchases of narcotics, which provided evidence of drug distribution consistent with information obtained by law enforcement through other investigative means.

29.    On this date, Detective Zupkosky directed CS-3 to contact "Papi" over a New Hampshire-based phone number ending in 4625 ("the 4625 Phone") and ordered a quantity of crack cocaine for $80.00. This is the telephone number which CS-3 provided Detective Zupkosky for "Papi." CS-3 was subject to standard checks before and after the purchase and equipped with and audio-video recording device. To complete the deal, CS-3 went to a prearranged location on Grove Street in Nashua, New Hampshire. At the designated time, CS-3 traveled and arrived at the meet location and eventually met with RAYDDY, who provided CS-3 with .403 grams of crack cocaine in exchange for U.S. Currency during their meeting. Surveillance units monitoring the meeting observed RAYDDY alone driving a gray 2017 Toyota Camry (the "gray Camry"), registered to GEORGE LUIS MARCIAL ("MARCIAL"). Although MARCIAL was occasionally seen on surveillance on the property of ███████████ in Nashua, subsequent surveillance of the gray Camry showed that RAYDDY appeared to be the primary operator of the vehicle, as RAYDDY was often seen driving the vehicle during this investigation.

***February 1, 2024 CS-3 controlled purchase of crack cocaine from RAYDDY with assistance from lookouts, including DELISON***

30.    On February 1, 2024, Detective Zupkosky utilized CS-3 for an additional controlled purchase of crack cocaine from RAYDDY in Nashua, which was arranged via the 4625 Phone.  During this transaction, surveillance units observed DELISON driving in the area of the transaction just prior to it occurring.  DELISON was driving a gray 2013 Honda Civic (the "gray 2013 Civic"), also registered to MARCIAL.  Detectives on surveillance in the area observed that DELISON and unidentified occupants of the gray 2013 Civic were conducting counter surveillance for RAYDDY, who arrived to the deal location in the gray Camry.  The occupants of the 2013 Civic remained inside the vehicle and only watched the location of the CS and RAYDDY during the controlled purchase.  RAYDDY ultimately provided 0.361 grams of crack cocaine to CS-3 in exchange for U.S Currency.  RAYDDY was alone in the gray Camry during the transaction.  After the transaction was complete, both the gray Camry and the gray 2013 Civic returned directly to the rear of ████████ in Nashua.  It should be noted that █ ████████ is attached to 35 Crown Street and that between the two addresses there are numerous apartments within the structure.  The amount of apartments is difficult to decipher from city of Nashua records however it is believed to be at least 20 apartments within.  CS-3 was subject to standard checks before and after the purchase and equipped with an audio-video recording device.  The recording corroborated the statement provided by CS-3 post deal and what surveillance members observed during the transaction.  The suspected narcotics seized during the transaction were later tested at the State of New Hampshire forensic laboratory yielding a positive result for crack cocaine.

**February 13, 2024 introduction of UC-2 by CS-3**
**during controlled purchase of crack cocaine from RAYDDY**

31.    On February 13, 2024, Detective Fitzpatrick while acting in an undercover capacity ("UC-2") conducted an additional controlled buy from RAYDDY accompanied by CS-3 by utilizing the 4625 Phone.  Surveillance units observed RAYDDY arrive at the deal location on Worcester Street in Nashua in the gray Camry.  This controlled purchase was completed by UC-2 in the gray Camry. CS-3 was also in the vehicle and facilitated the transaction between RAYDDY and UC-2.  After the transaction was complete, RAYDDY told UC-2, "my number, my number," leading UC-2 to believe that CS-3 successfully introduced him to RAYDDY to be able to make additional controlled purchases in the future.  CS-3 was subject to standard checks before and after the purchase and equipped with an audio-video recording device.  The suspected narcotics seized during the transaction were later tested at the State of New Hampshire forensic laboratory yielding a positive result for 0.719 grams of crack cocaine.

### February 14, 2024 UC-2 controlled purchase of crack cocaine from RAYDDY and post-deal travel directly to ████████████

32.    On February 14, 2024, UC-2 conducted an additional controlled buy from RAYDDY by utilizing the 4625 Phone.  This transaction was conducted on Tyler Street in Nashua and RAYDDY arrived alone in the gray Camry to the deal location.  During their meeting, UC-2 gave RAYDDY money in exchange for suspected narcotics believed to be crack cocaine.  After completing the transaction with UC-2, surveillance units observed RAYDDY drive directly back to ████████████ in Nashua.  RAYDDY was seen quickly entering the residence via a rear door (later confirmed to be Apartment 7—TARGET APARTMENT 1), presumably carrying with him the money from the sale with UC-2. He exited the residence via the same rear door shortly after and left the area.  The suspected narcotics were later tested at the State of New Hampshire forensic laboratory yielding a positive result for 0.760 grams of crack cocaine.

***February 21, 2024 UC-2 controlled purchase of crack cocaine from RAYDDY
and his ready access to ▆▆▆▆▆▆▆ via exterior door on east side of the building***

33.     On February 21, 2024, UC-2 conducted a controlled purchase of crack cocaine with RAYDDY after contacting him on the 4625 Phone. This transaction occurred in the area of the Wendy's restaurant on East Hollis Street in Nashua, and surveillance units observed RAYDDY travel to the deal location on a bicycle. Once with UC-2, RAYDDY provided UC-2 with suspected crack cocaine in exchange for U.S. Currency. Detectives maintained surveillance on ▆▆▆▆▆▆▆ in Nashua and observed RAYDDY exit the building just prior to the deal, travel uninterrupted to the deal location and immediately return to ▆▆▆▆▆▆▆ after the deal.

34.     According to a report of the buy surveillance, RAYDDY exited one of two doors on the (east) side of ▆▆▆▆▆▆▆ just prior to the deal, presumably bringing with him the amount of cocaine sufficient to complete the prearranged deal. According to the same report, RAYDDY then returned to the same side of the building after the deal and walked beneath an overhang and entered the door facing east, not the door on the same side that faces north.[1] I have also viewed a more recent photo of the east side of the building at ▆▆▆▆▆▆ treet, the same side that RAYDDY exited and entered, and observed an exterior door that faces north and another door beneath an overhang that faces east. The door that faces north is labeled with the number "12" and the door that faces east is labeled with the numbers "14," "15," and "16."

---

[1] Previously, in earlier affidavits, I mistakenly indicated that "[i]t was determined that RAYDDY went in and out of a door on the property with the number "7" on it possibly indicating Apartment 7 at the ▆▆▆▆▆▆ residence." (*See* Tracker Warrant #24-mj-258-01-AJ and affidavit at ¶ 31, dated October 4, 2024; Tracker Warrant #24-mj-304-01-AJ and affidavit at ¶ 31, dated November 15, 2024; and Tracker Warrant #24-mj-337-01-TSM and affidavit at ¶ 31). That was error. I have reviewed a detailed report concerning the surveillance conducted on the date of the controlled buy, which is consistent with my statements in this affidavit.

35.    Importantly, RAYDDY did not make any stops before meeting with UC-2, nor did he make any stops after meeting with UC-2 and returning to ███████████.  Based on these observations, I believe that the crack cocaine that RAYDDY sold to UC-2 was sourced from the premises within one of the two exterior doors on the east side of ███████████, and that RAYDDY then carried the money from the sale into the premises within the exterior door facing east, which I have confirmed to be an access door to several residential units, including Apartment 16—TARGET APARTMENT 2.  UC-2 was equipped with an audio-video recording device for this deal.  The suspected narcotics were later tested at the State of New Hampshire forensic laboratory yielding a positive result for 0.382 grams of crack cocaine.

**March 7, 2024 UC-2 controlled purchase of crack cocaine**
**from RAYDDY and MARCIAL, after leaving** ███████████

36.    On March 7, 2024, UC-2 conducted an additional purchase of crack cocaine from RAYDDY in the area of the Motel 6 on Progress Avenue in Nashua.  This transaction was arranged over the 4625 Phone used by RAYDDY.  Although RAYDDY speaks limited English, UC-2 recognized the voice as being his from previous transactions.  Once UC-2 confirmed the deal with the 4625 Phone, two Hispanic male subjects were seen exiting ███████████ and proceeding to the gray Camry that was parked out back from the location.  The males then traveled to UC-2's location and told UC-2 to get in the back seat.  While inside the vehicle, UC-2 handed RAYDDY the U.S. Currency as he was the driver of the gray Camry and the one whom UC-2 had arranged the deal with.  UC-2 also recognized the front right passenger as being MARCIAL—the registered owner of both the gray Camry and the gray 2013 Civic occupied by DELISON during the February 1, 2023, CS-3 controlled buy from RAYDDY.  UC-2 was familiar with MARCIAL and his appearance from this investigation as well as previous police

contacts.   Once RAYDDY had the U.S. Currency, MARCIAL stated "two?" to RAYDDY, and

MARCIAL then handed UC-2 two bags of suspected crack cocaine.

37.    Based on these observations, I believed that the crack cocaine that RAYDDY and

MARCIAL delivered to UC-2 was sourced from ████████████ .  Further, given the prior

observations of the February 21, 2024 controlled buy from RAYDDY and his ready access to █

█████████ via the exterior door on the east side of the building, I also believed that the crack

cocaine that RAYDDY and MARCIAL sold to UC-2 were probably sourced from the premises

accessed via the same exterior door on the east side of the ████████████ .

38.    UC-2 was equipped with an audio-video recording device for this deal.  The

suspected narcotics were later tested at the State of New Hampshire forensic laboratory yielding

a positive result of 0.810 grams of crack cocaine.

***Statements from CS-4 regarding another associate of DELISON
known to CS-4 as "Domingo" involved in crack cocaine distribution***

39.    On March 26, 2024, Detective Fitzpatrick met with a Nashua PD cooperating

source ("CS-4"), who provided information on an additional Hispanic male believed to be

associated with DELISON and ████████████ in Nashua, New Hampshire.  CS-4 informed

Detective Fitzpatrick that a Hispanic male who they knew as "Domingo" was a supplier of crack

cocaine.  CS-4 described "Domingo" as a Hispanic male with a New Hampshire-based phone

number ending in 3611 ("the 3611 Phone").  CS-4 advised that "Domingo" conducts his deals by

driving around in a white Honda sedan.

***March 28, 2024 planned UC-2 controlled purchase of crack cocaine from "Domingo"
thwarted by counter-surveillance from DELISON***

40.    On March 28, 2024, Detective Fitzpatrick and Detective Jowders arranged a

purchase of crack cocaine from "Domingo" in Nashua by contacting him via the 3611 Phone

provided by CS-4.  After confirming a location in Nashua for the deal to take place with

"Domingo", Detective Fitzpatrick observed DELISON drive the black 2009 Civic to the meet

location and position the vehicle advantageously, in an area where he had full view of the

parking lot meet location, as well as both the entrances and exits.  From that position, DELISON

appeared to be looking around the area in a manner that I believe was consistent with counter-

surveillance tactics commonly used by drug distributors to detect the presence of law

enforcement.  The original deal location was changed by "Domingo."  "Domingo" changed it to

an area down the street, at which time DELISON proceeded to that area and again repositioned

the vehicle in a similar advantageous place.  Ultimately, it was determined that DELISON

possibly detected Nashua PD detectives also repositioning, as the prearranged deal with

"Domingo" did not occur, was cancelled over the phone, and Detective Jowders was not supplied

the crack cocaine that day.

41.    Although this deal did not occur, I believe based on the apparent coordination

between DELISON and "Domingo" that the two were together.  Further, while communicating

with "Domingo," investigators believed that he was accompanied by a female subject, who

appeared to be assisting "Domingo" with language translation, as the female was overheard

communicating back and forth with "Domingo."  This was further corroborated once telephone

toll records were reviewed from that date, which showed contact between DELISON's 9084

Phone and "Domingo's" 3611 Phone within the same time frame of the planned drug sale.

***April 5, 2024 Nashua PD road stop of DELISON's white 2009 Civic driven by "Domingo"***

42.    On April 5, 2024, Nashua PD Officer Dennis Lee conducted a motor vehicle stop

of a white 2009 Honda Civic (the "white 2009 Civic"), registered to DELISON under the "Luis

Perez Tomassini" alias.  The operator identified himself as JUAN GABRIEL NOVA RUIZ

("NOVA RUIZ"), via a Dominican Republic driver's license. After reviewing the license photograph, Detective Jowders was able to confirm that NOVA RUIZ and "Domingo" were the same individual. CS-4 had previously given law enforcement a description for "Domingo" matching NOVA RUIZ and surveillance had also observed "Domingo" driving around Nashua. During physical and covert camera surveillance in the weeks leading up to this identification, investigators have observed NOVA RUIZ and the white 2009 Civic visit ████████████ in Nashua numerous times. The camera monitors the back of the residence at ████████████ and mainly captures the parking lot area, which is where this DTO's vehicles park and where the suspected DTO members meet and talk with one another. Numerous suspected DTO members have been seen operating the white 2009 Civic, to include DELISON and NOVA RUIZ.

***April 9, 2024 UC-3 controlled purchase of crack cocaine from NOVA RUIZ and post-deal travel to the rear of ████████████ and meet with DELISON***

43.     On April 9, 2024, Detective Jowders was working in an undercover capacity ("UC-3") and conducted a purchase of crack cocaine from NOVA RUIZ in Nashua, New Hampshire. This particular transaction was arranged by UC-3 over the 3611 Phone used by "Domingo," now identified as NOVA RUIZ. Other members of the Nashua PD NID assisted in this controlled purchase in a surveillance capacity. Prior to UC-3's meeting with NOVA RUIZ on Tyler Street in Nashua, NOVA RUIZ was surveilled leaving 7 Crown Street in Nashua, which is where DELISON's white 2009 Civic was parked. NOVA RUIZ then drove the white 2009 Civic directly to UC-3's location on Tyler Street and provided him crack cocaine in exchange for U.S. Currency. After the exchange, NOVA RUIZ was surveilled traveling directly back to the rear parking lot of ████████████. Once there, NOVA RUIZ was seen meeting up with DELISON briefly before the two separated and NOVA RUIZ drove back to 7 Crown Street.

NOVA RUIZ handed something to DELISON during this encounter, but the specific item was not identified.

44.     Based on these observations and my training and experience, I believe that NOVA RUIZ traveled to the rear of ▮▮▮▮▮▮▮▮ with the money from the drug sale. Further, given DELISON's direct involvement in prior cocaine sales in 2023, together with his indirect involvement as a lookout in a prior sale completed by RAYDDY and his indirect involvement as a lookout in an attempted sale prearranged by NOVA RUIZ, I also believe that the item NOVA RUIZ handed to DELISON was the money from the sale NOVA RUIZ made. Although DELISON was originally directly involved in drug sales, over the course of my investigation of his operations, he appears to have progressively sought to insulate himself by limiting his exposure and role to a lookout, as evidenced by his presence at two locations for deals prearranged by RAYDDY and NOVA RUIZ.

45.     UC-3 was equipped with an audio-video recording device for this deal.  The suspected narcotics were later tested at the State of New Hampshire Forensic Laboratory yielding a positive result for 0.851 grams of crack cocaine.

***May 1, 2024 UC-3 controlled purchase of crack cocaine from NOVA RUIZ after brief stop at ▮▮▮▮▮▮▮▮, and post-deal travel back to ▮▮▮▮▮▮▮▮***

46.     On May 1, 2024, UC-3 purchased a quantity of crack cocaine from NOVA RUIZ in Nashua, New Hampshire.  UC-3 arranged for the sale with NOVA RUIZ over the 3611 Phone. Immediately after this telephonic contact, surveillance units observed NOVA RUIZ leave 7 Crown Street in the white 2009 Civic and travel directly to ▮▮▮▮▮▮▮▮ in Nashua.  Shortly after, NOVA RUIZ left ▮▮▮▮▮▮▮▮ and traveled under surveillance to the area of West Hollis Street. It appeared to surveillance units in the area that NOVA RUIZ conducted at least one other hand-to-hand transaction consistent with a street level drug deal before meeting with

UC-3 in the area of Tyler Street, where UC-3 gave NOVA RUIZ money in exchange for a quantity of crack cocaine. After providing UC-3 with the crack cocaine, NOVA RUIZ traveled under surveillance directly back to ███████████. After approximately seven minutes, NOVA RUIZ left ███████████ and returned to 7 Crown Street.

47.    Based on these observations, including the brief stop at ███████████ prior to the deal, I believe that the crack cocaine NOVA RUIZ sold to UC-3 was sourced from ███████ ███. I also believe that NOVA RUIZ returned to and entered ███████████, presumably carrying with him the money from the sale, as surveillance did not observe NOVA RUIZ make any stops during his return to ███████████. Further, given the seven minutes he spent at ███ ███████ after the deal, I believe he may have accessed a residential unit within the building.

48.    UC-3 was equipped with an audio-video recording device for this deal. The suspected narcotics were later tested at the State of New Hampshire forensic laboratory yielding a positive result for 0.820 grams of crack cocaine.

*May 2024 surveillance and observations of DELISON and BELISARIO at ███████████,*
*including suspected narcotics deals conducted by BELISARIO after leaving ███████████*

49.    On May 2, 2024, Detective Corey Gobbi of the Nashua PD NID observed the white 2009 Civic driven by NOVA RUIZ travel east on Route 111 in Hudson, New Hampshire. This vehicle was surveilled to the area of Lawrence Street in Lawrence, Massachusetts, where it remained in that area for five to ten minutes before detectives were able to surveil the vehicle directly back to ███████████ in Nashua, New Hampshire. Once there, NOVA RUIZ met with DELISON in the rear parking lot briefly before the two separated and NOVA RUIZ returned to 7 Crown Street. NOVA RUIZ entered the residence holding a small rectangular package. I know that Lawrence, Massachusetts, is a source city for large quantities of narcotics being sold in New Hampshire or to New Hampshire residents. Based on the nature and scope of

the DTO, NOVA RUIZ's involvement in crack cocaine deals and close association with DELISON, I believe that the brief roundtrip from New Hampshire to Lawrence, Massachusetts, appeared to be consistent with the DTO obtaining a resupply of narcotics.

50.     On May 7, 2024, Detective Gobbi and Detective Fitzpatrick surveilled NOVA RUIZ in the white 2009 Civic travel to the area of Myrtle Street in Lawrence, Massachusetts, for a brief stop and then return directly back to 7 Crown Street in Nashua, New Hampshire.  This location is well known to investigators as being affiliated with narcotics trafficking.  Based on the totality of the circumstances, to include the observations made on May 2, 2024, investigators believed that the brief trip to Lawrence also appeared to be consistent with obtaining a resupply of narcotics.

51.     On May 15, 2024, Nashua PD Lieutenant Matthew McConnell and I were conducting surveillance in the area of ███████████ in Nashua.  DELISON, RAYDDY, and an individual believed to be DELISON's "uncle," BELISARIO LUIS DELISON ("BELISARIO") were all observed talking in the rear of the building.  Investigators believed that this is his uncle based on CS-1's statements as well as having the same last name.  This was important to the investigation because for the first time we were able to see all three individuals associating together at ███████████.

52.     Nearby was a 2013 Honda Civic bearing New Hampshire registration 5423707. This vehicle appears to be primarily used by BELISARIO, according to physical and stationary camera surveillance monitoring from May to July 2024.  Unless BELISARIO is driving the vehicle, this vehicle is almost always parked in the rear of ███████████.  The only other vehicle affiliated with this DTO that is also almost exclusively parked at ███████████ is a gray 2012 Honda Civic, New Hampshire registration #5429878 (the "gray 2012 Civic").  This

registration has changed numerous time during this investigation while still being exclusively operated by members of this DTO. At this point in time, the vehicle was registered to a Carmen De La Rosa De Guerrero, who is believed to be a female friend of DELISON.

53.    On the same date, May 15, 2024, at approximately 8:30 P.M., surveillance observed DELISON and BELISARIO outside the parking area adjacent to ███████████, next to the gray 2012 Civic and the gray 2013 Civic. DELISON was observed to be on his cell phone just prior to BELISARIO leaving the parking area in the gray 2013 Civic. BELISARIO travelled to the area of Harbor Avenue in Nashua, where he was waived down by a male who was waiting on the sidewalk adjacent to Pond Street. This male entered the vehicle and the vehicle travelled approximately 100 yards, before the male exited. BELISARIO then travelled to the area of 6th Street, where surveillance observed BELISARIO conduct a suspected a hand-to-hand drug transaction with a male who was waiting on the side of the street. Based on my training and experience, both meetings appeared consistent with street-level narcotic transactions. BELISARIO then returned directly to ███████████, parked the vehicle and entered the building via an east side door entrance.

54.    On May 29, 2024, Hudson, New Hampshire, Police Department ("Hudson PD") Lieutenant Matthew Broderick conducted a motor vehicle stop on the gray 2012 Civic, as it crossed over the Veteran's Bridge from Hudson into Nashua. The motor vehicle stop was due to an active suspension of the registered owner's driver's license and/or registration privileges. The registered owner of the 2012 gray Civic was "Luis Perez Tomassini," and the operator was DELISON, who presented a New Hampshire driver's license with the "Luis Perez Tomassini" name and identifying information. Post-arrest, DELISON admitted his true identity: ELIZARDO ESCARIA DELISON. A female subject, subsequently identified as TIFFANY

MILUZKA THOMAS ("THOMAS"), arrived to bail out DELISON and told investigators that she was DELISON's cousin and that DELISON's mother's name was Augustan Delison.

**June 4, 2024 UC-3 controlled purchase of crack cocaine from NOVA RUIZ**

55.    On June 4, 2024, UC-3 conducted an additional undercover purchase from NOVA RUIZ by contacting him via the 3611 Phone.  During a phone call, UC-3 was told by a female that UC-3 needed to provide an address, where UC-3 could meet "him" inside a house, because "he" doesn't see people on the street anymore.  UC-3 provided an address of 56 Tyler Street in Nashua.  Surveillance members observed a female operator of a gray 2013 Ford Fusion (the "gray 2013 Fusion") driving NOVA RUIZ to 56 Tyler Street for the transaction.  UC-3 subsequently got into the back seat of the vehicle.  NOVA RUIZ was in the passenger seat and handed UC-3 a bag of suspected crack cocaine for the pre-recorded U.S. Currency, after which UC-3 exited the vehicle.  UC-3 identified the driver of the gray 2013 Fusion as THOMAS, based on her driver's license photograph.  THOMAS was also the registered owner of the gray 2013 Fusion.  UC-3 further recognized THOMAS' voice as the same voice of the female who assisted "Domingo" and DELISON with Spanish translation during the March 28, 2024 attempted undercover purchase of narcotics.  UC-3 was equipped with an audio-video recording device for this deal.  The suspected narcotics were also later tested at the State of New Hampshire Forensic Laboratory yielding a positive result for 3.124 grams of crack cocaine.

**June 2024 observations of DELISON and RAYDDY,
updated statements from CS-4 regarding NOVA RUIZ's association with DELISON
and telephone tolls corroborating their reported association**

56.    On June 4, 2024, Detective Fitzpatrick met with CS-4 who provided additional information in reference to this DTO.  This meeting occurred in a public parking lot in Nashua.  During the meeting, the gray Camry driven by RAYDDY traveled into the same public parking

lot.  DELISON was the front seat passenger and only other occupant of the vehicle.  Without solicitation from Detective Fitzpatrick, CS-4 pointed towards DELISON and stated, "That's Domingo's boss."  CS-4 added that, during one of the first drug transactions that CS-4 had with "Domingo," DELISON was present for the transaction and "Domingo" introduced him as, "his boss."  CS-4 also advised that they have recently been purchasing fentanyl and crack cocaine. CS-4 claimed to purchase 10 grams of fentanyl for $130.00 directly from "Domingo," and that "Domingo" has been seen driving an additional vehicle, besides the white 2009 Civic, that matched the description of the gray 2013 Fusion and stated that "Domingo" was being driven by a darker skin Hispanic female.  CS-4 advised that CS-4 has paid "Domingo" and this female for drugs on each of their CashApp accounts, which investigators have identified.

57.    A review of telephone toll records for DELISON's 9084 Phone showed the following.  From February 18, 2024 to May 30, 2024, there were 895 contacts between the 9084 Phone used by DELISON and the 3611 Phone used by "Domingo."  The tolls also showed 21 contacts between DELISON's 9084 Phone and a phone number ending in 4574 ("the 4574 Phone"), which comes back as registered to THOMAS.  Based on data analysis associated with DELISON's 9084 Phone, it appears that the 9084 Phone was taken out of service around June 1, 2024.  Furthermore, from analyzing data from the 9084 Phone, to include top contacts and their common contacts, investigators believe that DELISON had a new phone ending in 1456.

58.    On June 5, 2024, Hudson PD Sergeant Matthew Flynn and Detective Frank McInnis observed the white 2009 Civic pull into a residential address in the area of Burns Hill Road in Hudson, New Hampshire.  The vehicle was only on the property for a short period of time before leaving the area.  During a subsequent motor vehicle stop of the white 2009 Civic for

a motor vehicle violation, the operator was identified as NOVA RUIZ and the passenger as DELISON.

***June 11, 2024 information from Hudson PD***
***concerning a reported crack cocaine dealer soliciting customers in Nashua***

59.     On June 11, 2024 a different source of information ("SOI-2") informed Nashua PD that they were approached by a crack cocaine dealer inside the Marshall's store on Northwest Boulevard in Nashua.  SOI-2 described the male as being Hispanic with dreadlock style hair and possibly gold teeth.  The male approached SOI-2, pulled out a bag of what appeared to be crack cocaine from his mouth and handed it to SOI-2 along with a New Hampshire-based phone number ending in 9324 ("the 9324 Phone").  The male told SOI-2 to give out the number to as many people as he could.  SOI-2 stated that he had not contacted the number since and did not have any additional information.

***June 12, 2024 UC-2 controlled purchase of crack cocaine from RAYDDY***

60.     On June 12, 2024, UC-2 conducted an additional purchase of crack cocaine from RAYDDY on Tyler Street in Nashua, New Hampshire.  RAYDDY was by himself operating the gray Camry for this transaction.  RAYDDY traveled directly to and from the deal from an address located above Milano's Pizza in Nashua.  It is believed the address where the apartment is located is 114 Amherst Street.  RAYDDY provided UC-2 the suspected crack cocaine in exchange for a quantity of U.S. Currency.  UC-2 was equipped with an audio-video recording device for this deal.  The State of New Hampshire Forensic Laboratory determined the substance to be 1.274 grams of crack cocaine.

***June 12, 2024 UC-3 controlled purchase of crack cocaine from NOVA RUIZ***

61.     On June 12, 2024, UC-3 contacted NOVA RUIZ via the 3611 Phone looking to facilitate a controlled purchase of crack cocaine.  However, NOVA RUIZ later contacted UC-3

from a phone number ending in 2595 ("the 2595 Phone") and said he changed his number.  Prior to the deal, law enforcement surveilled NOVA RUIZ from the area of 28-30 Amory Street to 56 Tyler Street in Nashua, New Hampshire, where he provided UC-3 with suspected crack cocaine in exchange for pre-recorded U.S. Currency.  Prior to the deal with UC-3, NOVA RUIZ met with a female subject in the area of C street in Nashua and conducted what appeared to be another hand-to-hand drug transaction.  NOVA RUIZ operated the white 2009 Civic for these transactions.  UC-3 was equipped with an audio-video recording device for this deal.  The suspected narcotics were later tested at the State of New Hampshire Forensic Laboratory yielding a positive result for 2.936 grams of crack cocaine.

***Report from CS-5 regarding a 0034 Phone used by "Luis"
and "Luis'" possible source of narcotics supply in Lawrence***

62.    On June 13, 2024, Nashua PD Detective Gobbi spoke with a cooperating source ("CS-5") who provided additional intelligence on this DTO, particularly information about a male subject known to CS-5 as "Luis."  CS-5 advised that they had purchased crack cocaine from "Luis" and that "Luis" gave them a telephone number ending in 0034 ("the 0034 Phone") to contact him for additional narcotics transactions.  CS-5's description of "Luis" matched DELISON, based on Detective Gobbi's familiarity with DELISON from his experience with this investigation.  Based on conversations that CS-5 had with DELISON, CS-5 believed that DELISON's source of supply in Massachusetts was a family member, who lived in Lawrence, Massachusetts. CS-5's information was consistent with observations independently made by investigators previously, on May 2, 2024 and May 7, 2024, when the white 2009 Civic operated by DELISON's associate, NOVA RUIZ, made brief roundtrips to Lawrence, which investigators believe to be an effort to secure a resupply of narcotics.

***June 17, 2024 information from Hudson PD***

*concerning a reported crack cocaine dealer soliciting new customers*

63.    On June 17, 2024 I reviewed a Hudson PD report  in which a female patron of Walmart located at 254 Lowell Road, Hudson, New Hampshire, reported to an Walmart loss prevention employee that while in the store, she was approached by a Hispanic male who gave her a baggie that he removed from his mouth that contained a free sample of suspected crack cocaine and a piece of paper with the 9324 Phone number. The female patron provided the suspected crack cocaine to Loss Prevention who contacted the Hudson PD.

*June 18, 2024 UC-2 controlled purchase of crack cocaine from*
*the reported dealer soliciting customers*

64.    On June 18, 2024, UC-2 contacted the 9324 Phone in an attempt to arrange a controlled purchase of crack cocaine.  UC-2 spoke to, and text messaged with a male who agreed to sell UC-2 crack cocaine in the area of Tyler Street in Nashua.  Later that evening, a heavy-set Hispanic male met with UC-2 and provided him crack cocaine in exchange for a quantity of U.S. Currency.  The suspect left the area of Tyler Street in a green 2013 Hyundai Sonata bearing New Hampshire registration plates ("the green 2013 Sonata").  Upon comparing surveillance photographs associated with Hudson PD's incident at Walmart and the male that UC-2 met during this controlled purchase, UC-2 confirmed it was the same suspect.  UC-2 was equipped with an audio-video recording device for this deal.  The suspected narcotics were later tested at the State of New Hampshire Forensic Laboratory yielding a positive result for 0.931 grams of crack cocaine. Following this transaction, UC-2 received an unsolicited text message from the male on the 9324 Phone advising that he "had brown too."  Based on my training and experience, I know that the term "brown" is slang for heroin/fentanyl.

65.    Upon conducting research on the green 2013 Sonata, I discovered to be registered to a Rafael Del Rosario.  This is the same registered owner of the white Civic, which has been

driven by NOVA RUIZ. Upon researching the registered owner, Del Rosario, investigators determined that he has not been seen directly involved in this investigation to date other than registering vehicles. The green 2013 Sonata registration was issued on June 14, 2024, while the white Civic registration was issued on April 8, 2024.

**Statements from CS-6 regarding DELISON and UHM-1, and DELISON's reported involvement in narcotics trafficking consistent with information previously obtained and corroborated**

66.   On June 19, 2024, I met with a cooperating source ("CS-6"), who wished to provide information on this DTO, specifically about a male subject known to CS-6 as "Luis."

67.   CS-6 walked into the Nashua PD lobby to voluntarily provide this information as they stated that they believed that drug dealers should be arrested as selling drugs is not an ethical way to make money. CS-6 advised that a Dominican male named "Luis" with a telephone number ending in 9084 was a drug dealer in the Nashua, New Hampshire, area. CS-6 described "Luis" as the biggest drug dealer in the area and that he was a "boss" of a large operation with others who work beneath him. CS-6 advised that "Luis" was from the Dominican Republic and was making a lot of money selling drugs in the area. CS-6 advised that "Luis" wore expensive jewelry and commonly had a lot of cash on his person. CS-6 said that "Luis" picks up his drugs somewhere in Massachusetts for distribution in New Hampshire. CS-6 advised that, within the past week, CS-6 overheard "Luis" having a telephone conversation in a public setting, where "Luis" was telling the person on the other line that they had recently picked up a "kilo" and that it was "going fast," so if they needed something they needed to hurry. CS-6 advised this conversation was in Spanish, but that was a synopsis of what was discussed during the phone call that CS-6 overheard "Luis" having in a public place. CS-6 speaks Spanish and English. CS-6 advised that "Luis" also routinely takes telephone calls in public, where "Luis"

will talk about a dollar amount and an address.  CS-6 said that "Luis" then calls someone else and directs them where to go.  CS-6 concluded that they believed this was "Luis's" customers calling and ordering drugs and then "Luis" sending someone to sell the drugs.  CS-6 claimed that a few months prior, around April or May of 2024, they heard "Luis" talk about being traded a firearm in exchange for something.  CS-6 believed this was for drugs, although the phone call they overheard did not specify.  CS-6 confirmed that while overhearing these particular phone calls, CS-6 was in a public setting with numerous people around "Luis" and that "Luis" did not make any attempt to hide his criminal activities and openly talks on the phone about it in public.

68.    To support their claims, CS-6 provided photographs taken from social media which showed a group photo of DELISON, BELISARIO, and a third younger Hispanic male with braided hair ("UHM-1").  DELISON was known to CS-6 as "Luis."  CS-6 advised this third individual, UHM-1, was "Luis's" brother, who "Luis" recently paid to have smuggled over the U.S.-Mexico border to come up to New Hampshire.

69.    CS-6 was compensated for this information.  I paid CS-6 $100 approximately one week after CS-6 provided this information.  However, no additional compensation was given to CS-6.  Also, law enforcement has obtained information concerning drug distribution by CS-6 unrelated to this DTO, which was unknown to me at the time that CS-6 provided the above information and unknown to me at the time that CS-6 was paid.  A subsequent criminal history check for CS-6 further revealed several charges, including simple assault, possession and transportation of drugs from 2015, and false reporting of accidents, and just one conviction for disorderly conduct.

70.    Notwithstanding these disclosures, I find CS-6's information regarding narcotics distribution by DELISON to be credible and reliable for a couple of reasons.  First, the identity

and contact information of CS-6, including their first and last names, active telephone number, and address, are known to me and other law enforcement agents involved in this investigation. Second, and more importantly, I have been able to independently corroborate material aspects of the information provided by CS-6 during this investigation.

71.    CS-6 seemed to have some knowledge of DELISON from knowing him within the Nashua community. CS-6's claims about him being the biggest dealer in Nashua as well as the "boss" of the operation are independently supported by the extensive amount of surveillance time and investigation which has gone into this DTO. Although controlled buys have been in smaller quantities, this DTO has a vast customer base serving Nashua and the surrounding towns. This is also corroborated by the increasing amount of DTO members, which has grown since 2023.

72.    In the days surrounding the meeting with CS-6, physical and stationary camera surveillance in the area of ████████ in Nashua showed the same younger Hispanic male, UHM-1, at ████████ with DELISON and BELISARIO in the rear parking lot. DELISON and UHM-1 would commonly drive around together in the gray 2012 Civic. At this time in the investigation, the gray 2012 Civic appeared to be the primary vehicle used by DELISON.

**June 25, 2024 seizure of crack cocaine during stop of male subject**
**after meeting with BELISARIO**

73.    On June 25, 2024, Detective Fitzpatrick was conducting surveillance in the area of McDonald's on East Hollis Street in Nashua when he observed a male meet with BELISARIO inside BELISARIO'S 2013 Civic. This male then quickly exited BELISARIO's 2013 Civic and was seen placing an item in his hat. Nashua PD Officer Alex Mann stopped this male who he suspected of purchasing narcotics from BELISARIO. The male was found to be in possession of a quantity of crack cocaine within his hat and was arrested. A New Hampshire Laboratory report

later confirmed the sample to be crack cocaine.  This arrestee would not provide the identity of the dealer but acknowledged he purchased the narcotics that day.

*July 8, 2024 suspected narcotics deliveries by UHM-1*

74.     On July 8, 2024, Detective Jowders observed the 2012 Civic travelling around Nashua, New Hampshire, to include the area of Auburn Street, where the vehicle made a quick stop of less than 10 seconds at an address in that area.  UHM-1 entered the address and quickly returned back to the vehicle.  Detective Jowders recognized this behavior to be indicative of a street-level narcotics deal, similar to the undercover narcotics transactions that were completed with NOVA RUIZ.  Detective Jowders advised that 2012 Civic thereafter traveled to the rear of ███████████ in Nashua.  During his travels back, Nashua PD Officer Alex Mann and Officer Michael Casey conducted a motor vehicle stop of the 2012 Civic for a motor vehicle violation, The male operator, UHM-1, presented a Dominican Republic license identifying himself as ROUSEVER ALEXANDER ESCARIA DELISON ("ROUSEVER").  ROUSEVER then returned back to ████████████.  Later in that same evening, surveillance units observed ROUSEVER make an additional stop in the vehicle at the location on Auburn Street similar to the first suspected narcotics deal.  It was a short stop in and out of the location, behavior which investigators believe was indicative of a street-level narcotics deal.

*July 8, 2024 controlled purchases of crack cocaine and fentanyl*
*/ Mario DE JESUS CASTILLO identified*

75.     On July 8, 2024, UC-2 conducted an additional undercover purchase of crack cocaine from the Hispanic male with the 9324 Phone.  Similar to the transaction which occurred on June 18, 2024, this Hispanic male provided UC-2 a quantity of crack cocaine in exchange for U.S. currency during their meeting in the area of Tyler Street in Nashua.  UC-2 was equipped with an audio-video recording device for this deal.  The suspect left the area in a green 2013

Hyundai Sonata bearing New Hampshire registration plates and traveled to the residence of 7 Revere Street in Nashua.  Laboratory results confirmed this sample to be 0.702 grams of crack cocaine.

76.      On July 9, 2024, Detective Fitzpatrick was conducting surveillance in the area 7 Revere Street, Nashua.  Detective Fitzpatrick saw the green 2013 Sonata traveling northerly along Main Street.  Officer Linehan conducted a traffic stop of the vehicle to address an equipment violation, at which time the operator was identified as MARIO DE JESUS CASTILLO ("DE JESUS CASTILO") of Lawrence, Massachusetts.  A New Hampshire DMV query of DE JESUS CASTILLO revealed a non-driver identification card issued to this individual with the listed address of 7 Revere Street in Nashua, New Hampshire.

77.      On July 9, 2024, UC-2 contacted DE JESUS CASTILLO via the 9324 Phone in an attempt to purchase a quantity of fentanyl in the area of Tyler Street in Nashua.  At approximately 9:43 P.M., UC-2 received a text message from DE JESUS CASTILLO on the 9324 Phone indicating he was at 57 Tyler Street, which is a large apartment building. Simultaneously, UC-2 observed DE JESUS CASTILLO standing at the door.  DE JESUS CASTILLO was wearing the same clothing from the time of the motor vehicle stop where he was positively identified.  DE JESUS CASTILLO provided UC-2 with a tan powder substance in exchange for a quantity of U.S. Currency.  Following the deal, DE JESUS CASTILLO entered his green 2013 Sonata and traveled to 7 Revere Street in Nashua.  New Hampshire Forensic Laboratory results later confirmed this sample to be 10.58 grams of fentanyl.

78.      On July 10, 2024, UC-2 contacted DE JESUS CASTILLO via the 9324 Phone in an attempt to set up a purchase of 50 grams of fentanyl in the area of Tyler Street in Nashua. The two agreed to meet in the area to discuss the transaction.  During this meet, DE JESUS

CASTILLO noticed a bulge on UC-2's belt line and seemed nervous of why he would be armed with a pistol. DE JESUS CASTILLO later explained to UC-2 that he "worked for someone else" and that he would need to go home to see if he had 50 grams of fentanyl to sell to UC-2. Ultimately, DE JESUS CASTILLO travelled to 7 Revere Street and told UC-2 that he did not have 50 grams of fentanyl at this time and the deal did not occur.

79.     While conducting surveillance on DE JESUS CASTILLO's residence during this back and forth, law enforcement observed DE JESUS CASTILLO leaving the house and standing on the street outside his residence. RAYDDY was observed driving up to DE JESUS CASTILLO in the gray Camry. RAYDDY then handed DE JESUS CASTILLO a white plastic bag wrapped up with something inside it before leaving the area. DE JESUS CASTILLO then walked into 7 Revere Street. Based on my training and experience with this particular DTO, this observed behavior was indicative of a drug deal, based partly RAYDDY's prior narcotics sales and the brevity of the encounter with DE JESUS CASTILLO. Based on these observations, I believe that RAYDDY was providing a quantity of narcotics to DE JESUS CASTILLO for resale. These observations and belief also elevated my suspicions that DE JESUS CASTILLO was part of the same DTO involving DELISON and RAYDDY.

**July 10, 2024 UC-3 controlled purchase of crack cocaine from NOVA RUIZ**

80.     On July 10, 2024, UC-3 contacted NOVA RUIZ on the 2595 Phone to arrange the purchase of crack cocaine in Nashua, New Hampshire. NOVA RUIZ agreed to the deal and was surveilled from his residence at 28 Amory Street to the deal location on Tyler Street. NOVA RUIZ was driven by THOMAS in the white 2009 Civic. UC-3 was equipped with an audio-video recording device for this deal. After providing UC-3 the bag of crack cocaine, NOVA RUIZ and THOMAS drove back to 28 Amory Street and went inside the residence. The

suspected narcotics were later tested at the State of New Hampshire Forensic Laboratory yielding a positive result of 7.636 grams of crack cocaine. Before arriving at the deal location, surveillance units observed THOMAS drop off NOVA RUIZ a block away from the deal location and then proceed to park even further down the street while NOVA RUIZ conducted the transaction. After the transaction was complete, THOMAS drove back to the area and picked up NOVA RUIZ. THOMAS did not do anything else while away from the area and only seemed to be waiting to pick up NOVA RUIZ.

***July 29, 2024 arrest of suspected DTO customer and seizure of crack cocaine, following meeting with DELISON***

81.     On July 29, 2024, Detective Jowders was conducting surveillance on DELISON when he observed a male enter the back seat of the gray 2012 Civic, which was being driven by DELISON. DELISON then drove with the male a short distance down the street and dropped him off within a matter of seconds in the area of Palm Street in Nashua. Recognizing this behavior as being indicative of a street-level narcotics transaction, Detective Jowders notified officers to make contact with the male who met with DELISON. This male was subsequently arrested after being found to be in possession of a quantity of suspected crack cocaine, which he admitted to purchasing from "the foreign male" who was operating the gray Civic. A New Hampshire Forensic Laboratory report later confirmed the suspected narcotics to be 2.94 grams of crack cocaine.

***October 24, 2024 observations of DELISON and his travel to Lawrence Street and Myrtle Street in Lawrence***

82.     On October 24, 2024, I conducted surveillance on DELISON and an unknown Hispanic male passenger as they drove roundtrip from Nashua to Lawrence. DELISON traveled to the area of 178 Lawrence Street by the intersection with Myrtle Street, which appears to be a

commercial area with store fronts.  Once at that location, I observed DELISON meeting with numerous individuals who were parked in a parking lot as well as he went in and out of an establishment on that property.  Due to limited surveillance angles, I was unable to see DELISON leave the area with anything in his hands.  However, he was only at that location for approximately 10 minutes.  DELISON then drove to the driveway of 174 East Haverhill Street and received an envelope from a female, who was waiting at that location.  DELISON and his passenger then travelled back to Nashua and surveillance was terminated.  It should be noted DELISON's stop in the vicinity of Lawrence Street and Myrtle Street is the same location that NOVA RUIZ traveled to on May 7, 2024 for a short period of time.  As I have noted in earlier in this affidavit, Lawrence, Massachusetts, is a source city for narcotics that are distributed in New Hampshire, and I am also familiar with this particular area of Lawrence Street and Myrtle Street as a location frequented by drug trafficking organizations, based on drug investigations in which I have participated.

***November 4, 2024 UC-3 controlled purchase of crack cocaine from RAYDDY,
and subsequent observations of DELISON, RAYDDY, and DE JESUS CASTILLO together***

83.    On November 4, 2024, UC-3 contacted RAYDDY via the 4625 Phone in an attempt to purchase a quantity of crack cocaine.  RAYDDY agreed to the deal and ultimately met UC-3 in the area of Tyler Street in Nashua.  RAYDDY arrived at the deal in the gray Camry and was the only one in the vehicle.  While inside the gray Camry, UC-3 observed three (3) additional bags of suspected crack cocaine packaged for sale within RAYDDY's driver's door compartment.  RAYDDY ultimately provided UC-3 with a quantity of crack cocaine in exchange for U.S. Currency.  RAYDDY was surveilled to and from the transaction.  RAYDDY left his residence of 114 Amherst Street in Nashua and returned to the same location after the

transaction.  UC-3 was equipped with an audio-video recording device for this deal.  A DEA laboratory report later confirmed this sample to be 2.5 grams of crack cocaine.

84.      Later the same evening, NID Detectives assisted me with surveillance on the gray Camry as it drove from ▮▮▮▮▮▮▮▮ into Hudson, New Hampshire.  During this surveillance, DELISON was observed to be driving while RAYDDY was observed to be the only other occupant in the vehicle.  After responding to two different locations in Hudson with short stays, less than one minute each, the pair travelled to Lawrence, Massachusetts.  Again, based on my training and experience, I believe that these short stops in Hudson at residential locations were indicative of street-level narcotics transactions.

85.      Once in Lawrence, Massachusetts, DELISON and RAYDDY were surveilled to the intersection of Lawrence Street and Myrtle Street, the same area where NOVA RUIZ was observed to go on May 7, 2024, and the same area where DELISON traveled to more recently on October 24, 2024.  The two lingered around the parking lot of 178 Lawrence Street for a period of time before ultimately meeting up with DE JESUS CASTILLO, who entered the rear left passenger seat of the gray Camry.  The three were seen talking in the vehicle before proceeding to the area of 429 Broadway Street in Lawrence.  Once there, the three went inside the location which appears to be a clothing store.  After entering the store, the three were out of view for approximately 10 minutes.  The three then responded back to the parking lot of 178 Lawrence Street, where DE JESUS CASTILLO separated from RAYDDY and DELISON.  RAYDDY and DELISON then drove back to Nashua, at which time a motor vehicle stop was conducted on them in the area of Bridge Street.  DELISON was observed to be in possession of a valid Massachusetts driver's license in that same name.  Due to his driving privileges being suspended in New Hampshire, a summons was issued to him.  DELISON was observed to be in possession

of at least three cell phones during the stop.  Based on my training and experience, I know that

drug distributors typically carry more than one cell phone, which are often times used separately

for personal matters and drug business.

**November 12, 2024 UC-3 controlled purchase of crack cocaine from RAYDDY**
**driven by BELISARIO in the 2013 Civic**

86.    On November 12, 2024, UC-3 contacted RAYDDY in an attempt to conduct a

controlled purchase a quantity of crack cocaine.  RAYDDY agreed to the transaction and

ultimately met UC-3 in the area of Wendy's on East Hollis Street in Nashua.  RAYDDY was

positively identified as an occupant of the 2013 Civic driven by BELISARIO.  The vehicle was

surveilled to come directly from ███████████ to Wendy's, where RAYDDY provided UC-3

with a quantity of crack cocaine in exchange for U.S. Currency.  After this transaction,

RAYDDY, BELISARIO, and an unidentified female traveled to the area of 30 Ledge Street, at

which time BELISARIO entered the property for less than a minute before leaving the location.

Detectives recognized this behavior as being indicative of a drug deal based on their training and

experience, as well as the history of conducting surveillance on this particular DTO.  The

unidentified female was dropped off in the area of Central Street, at which time RAYDDY and

BELISARO then traveled in the vehicle directly back to ███████████ and entered the

location.  A DEA laboratory report for the suspected narcotics seized yielded a positive result of

6.485 grams of cocaine.

**November 21, 2024 UC-3 controlled purchase of crack cocaine from RAYDDY,**
**after leaving ███████████, and post-deal travel back to ███████████ and access via the**
**east side of the building**

87.    On November 21, 2024, UC-3 contacted RAYDDY in an attempt to purchase a

quantity of crack cocaine in the area of Tyler Street in Nashua.  UC-3 contacted RAYDDY via

the 4625 Phone.  Once RAYDDY agreed to the transaction with UC-3, surveillance was set up

in the area of ███████████ on the gray 2013 Civic bearing New Hampshire registration 5423707. RAYDDY was seen leaving ███████████ in that vehicle and proceeding to the area of 30 Ledge Street, where he made a brief stop. It should be noted this Ledge Street address has been known to be associated with a customer of this DTO based on telephone toll records and physical surveillance of DTO members. Surveillance units followed RAYDDY to the area of East Hollis Street by Harbor Avenue, where he picked up UC-3 and provided him a quantity of crack cocaine in exchange for U.S. Currency. After the deal, RAYDDY left the area and quickly drove back to ███████████ and entered the building on the left (east) side of the residence. Prior to arriving at ███████████, RAYDDY was driving slightly erratic taking numerous turns. From my training and experience, I recognized this to be counter-surveillance commonly used by drug distributors to ensure they are not being followed after a narcotics transaction.

88.     Based on these observations and my knowledge of this DTO, I believe that RAYDDY brought the crack cocaine from a residential unit within ███████████ to conduct a narcotics deal on Ledge Street before completing the prearranged deal with UC-3 in the area of East Hollis Street. Similarly, after the deals, I believe that RAYDDY returned to ███████ ███, presumably carrying with him the money from the sale with UC-3 (and proceeds from the Ledge Street suspected deal) into a residential unit accessible via the east side of the building.

89.     UC-3 was equipped with an audio-video recording device for this deal. A DEA laboratory report associated with the crack cocaine seized during this deal yielded a positive result of 14.23 grams of crack cocaine.

***December 10, 2024 UC-3 controlled purchase of crack cocaine from RAYDDY and post-deal travel back to ███████████ and access via the east side of the building***

90.     On December 10, 2024, UC-3 contacted RAYDDY in an attempt to purchase a quantity of crack cocaine from him in the area of Tyler Street in Nashua. Once contact was made with RAYDDY, surveillance was established on RAYDDY in the area of Speedway gas station on East Hollis Street in Nashua. RAYDDY was operating the gray 2013 Civic bearing New Hampshire 5423707 and was the sole occupant of the vehicle for the duration of the surveillance. RAYDDY was surveilled to the area of 6th street in Nashua, where he made a stop in that area for approximately one minute. It was believed to be in the area of 10 6th Street. RAYDDY was then surveilled to the area of Deer Run in Hudson, New Hampshire, where he also stayed for approximately one minute. I believe that both of these stops were narcotics transactions, based on the brief time that RAYDDY stayed at each location, as well as prior intelligence gathered in this investigation to suggest that this particular DTO has at least one customer who lives in the area of 6th Street and two or more customers who have been linked to addresses on Deer Run in Hudson. This corroboration is based on telephone call records from phones affiliated with this DTO as well as physical and electronic surveillance conducted on DELISON and his co-conspirators. RAYDDY met with UC-3 in the area of Harbor Avenue and provided him the crack cocaine in exchange for U.S. Currency.

91.     Following the deal, RAYDDY was surveilled directly back to ▮▮▮▮▮▮▮▮▮▮, at which time he parked the vehicle in the rear of the location and entered via a door on the east side of the building, presumably carrying with him the money from the sale to UC-3 (and the proceeds from the suspected 6th Street and Deer Run deals) into a residential unit accessible via the east side of the building. A DEA laboratory report associated with the narcotics seized during the deal yielded a positive result of 13.896 grams of crack cocaine.

***December 19, 2024 CS-7 controlled purchase of crack cocaine from DE JESUS CASTILLO***

92.     On December 19, 2024, Hudson PD conducted a controlled purchase of crack cocaine from DE JESUS CASTILLO with the assistance of a cooperating source ("CS-7").

93.     I know that CS-7 has a criminal history in New Hampshire, which includes three convictions from the 1990s.  CS-7 has a felony forgery conviction from Hillsborough County Superior Court from May 5, 1998; a Class B misdemeanor conviction for false report to law enforcement from July 6, 1995, and violation of parole conviction from October 25, 1999.  I know that CS-7 has admitted to past involvement in drug use and/or distribution.  I also know that CS-7 is cooperating with law enforcement in exchange for possible consideration or leniency in a pending New Hampshire state felony drug case against CS-7.  CS-7 has not been given monetary compensation by investigators in this case.

94.     Notwithstanding these disclosures, I find CS-7's information regarding narcotics distribution to be credible and reliable for several reasons.  First, CS-7 has a basis of knowledge of the drug activities under investigation and is familiar with "Mario" based on past interactions.  Given CS-7's involvement in prior drug use and/or distribution, CS-7 knows what narcotics look like and how they are packaged for distribution and distributed, and knows the jargon associated with drug distribution, the various drug types and quantities, and the prices typically charged for narcotics.  CS-7 has personally known "Mario" for some time and bought narcotics from him.  Second, the identity and contact information of CS-7, including their first and last names, active telephone number, and current address, are known to me and other law enforcement agents involved in this investigation.  Third, I have been able to independently corroborate material aspects of the information provided by CS-7 during this investigation.  At the direction and under the supervision of law enforcement, CS-7 has conducted controlled purchases of narcotics, which provided evidence of drug distribution consistent with information obtained by law enforcement

through other investigative means.  Fourth, CS-7 has also provided information in other drug investigations.

95.     On this same date, December 19, 2024, CS-7 contacted DE JESUS CASTILLO via a New Hampshire-based phone number ending in 5665 and knew the dealers name to be "Mario."  A male who fit the description of DE JESUS CASTILLO ultimately arrived at the location and provided CS-7 a quantity of crack cocaine in return for U.S. Currency. Investigators monitoring the transaction followed the male believed to be DE JESUS CASTILLO back to Nashua where surveillance was terminated in the area of East Hollis Street by Chase Street.  CS-7 turned the drugs over to investigators and confirmed they purchased them from "Mario."  CS-7's debrief corroborated surveillance conducted by investigators on scene for the controlled buy.  CS-7 was subject to standard checks before and after the controlled buy, which was monitored by surveillance detectives on scene, and CS-7 was also equipped with an audio-video recording device, although I am informed that the recording failed.  A DEA laboratory report associated with the narcotics seized during the deal yielded a positive result of 1.62 grams of crack cocaine.

***December 30, 2024 CS-7 controlled purchase of crack cocaine from DE JESUS CASTILLO***

96.     On December 30, 2024, Hudson PD conducted a controlled purchase of crack cocaine from DE JESUS CASTILLO utilizing CS-7.  Acting at the direction of Hudson PD, CS-7 contacted DE JESUS CASTILLO via the 5665 Phone and knew the dealers name to be "Mario."  A male who fit the description of DE JESUS CASTILLO ultimately arrived at the location and provided CS-7 a quantity of crack cocaine in return for U.S. Currency.  CS-7 ultimately turned the crack cocaine over to investigators and informed them they purchased the crack cocaine from "Mario".  CS-7's debrief of the deal with Mario was consistent with

43

observations made by surveillance detectives on scene.   Investigators monitoring the transaction followed the male, positively identifying him as DE JESUS CASTILLO, back to Nashua where surveillance was terminated in the area of Revere Street.  CS-7 was subject to standard checks before and after the controlled buy, which was monitored by surveillance detectives on scene, and CS-7 was also equipped with an audio-video recording device, although I am informed that the recording failed.  A DEA laboratory report associated with the narcotics seized during the deal yielded a positive result of 0.798 grams of crack cocaine.

***Observations of DELISON and his gray 2012 Civic***

97.    Between October 10, 2024 and December 30, 2024, an electronic monitoring device was installed on DELISON's gray 2012 Civic, pursuant to a search warrant issued by United States Magistrate Judge Talesha L. Saint-Marc.  (See 24-mj-258-01-TSM; and 24-mj-304-01-AJ).

98.    To summarize, DELISON and his vehicle have been surveilled making a large number of short stops in the southern New Hampshire area to include the communities of Nashua, Hudson, Litchfield, and Manchester.  Furthermore, DELISON has been frequenting the same area by the intersection of Myrtle Street and Lawrence Street in Lawrence, Massachusetts, as well as other locations in that area.

99.    From my training and experience of the review of this data, coupled with extensive physical surveillance conducted on DELISON and his co-conspirators, I believe that DELISON is the leader of a significant drug trafficking organization in southern New Hampshire, which is shown by his pattern of life on a day-to-day basis.  During extensive surveillance operations of DELISON, investigators have not observed behavior indicative of maintaining traditional employment.  That is, investigators have not observed DELISON follow

a particular schedule or travel to locations for extended periods of time that is otherwise

consistent with a work shift.

***January 2, 2025 seizure of suspected cocaine from individual stopped by law enforcement after observed meeting with DELISON in his gray 2012 Civic, and statements regarding TARGET APARTMENT 2***

100.    On January 2, 2025, Detective Ryan MacDonald was conducting surveillance on

DELISON within his gray 2012 Civic in the area of Cross Street and Jefferson Street in Nashua.

Detective MacDonald observed a black pick-up truck in the area which met up with DELISON

quickly before the two separated, consistent with a brief meeting to conduct a street-level

narcotics transaction.  As a result, a motor vehicle stop was conducted by Nashua PD Sergeant

Ryan Jones and Officer Mann on the black pick-up truck and an occupant was found to be in

possession of a quantity of suspected cocaine.  In a post-arrest *Mirandized* interview, this

defendant informed me that he had just purchased the cocaine from the Hispanic male in the

Civic, referring to DELISON's gray 2012 Civic.  This information concerning DELISON as a

drug distributor was consistent with information investigators have independently obtained

during this investigation.

101.    Furthermore, this defendant indicated they used to live in ████████████ in a

different apartment and were aware that the dealer resided at ████████████ in Nashua and was

in business with others to include the dealer's "Uncle."  This information concerning

DELISON's residence at ████████████ and criminal association with his "Uncle" was also

consistent with information investigators have independently obtained during this investigation,

which indicate that DELISON's uncle, BELISARIO, has been implicated in previous deals.

102.    It is important to note that Detective Macdonald was able to positively identify DELISON as being the male with whom this defendant met.  A presumptive field test of the suspected narcotics seized during the arrest yielded a positive result for the presence of cocaine.

103.    The defendant provided a New Hampshire-based phone number ending in 0699 for the dealer he met, who was known to him as "Cache" or "Tecache," which appear to be abbreviations or variations of the name "Cache Perez" that other cooperating individuals have reported to law enforcement when discussing the activities of DELISON.  This cooperating defendant advised they have been purchasing powder cocaine and crack cocaine from "Cache" for at least six months.

104.    The defendant indicated that he had seen "Tecache" and his "Uncle" within an apartment believed to belong to at least one of them on the second floor of ▮▮▮▮▮▮▮▮.  The defendant explained this was 6 months prior to this statement.   The defendant described an exterior door entrance on the left (east) side of the building, which leads to a set of stairs to the second floor.  Once on the second floor, the cooperating defendant said it was the door on the right.  This information concerning the second-floor apartment is consistent with information investigators have independently obtained during this investigation.  As discussed earlier in this affidavit, after a drug deal, RAYDDY was observed entering the exterior door that faces east on the left side of ▮▮▮▮▮▮▮, which investigators determined permits access to several residential units, including Apartment 16—TARGET APARTMENT 2.

### January 7, 2025 observations of DELISON and BELISARIO entering, respectively, TARGET APARTMENT 1 and presumably TARGET APARTMENT 2

105.    On January 7, 2025, Nashua PD NID and DEA conducted surveillance on members of this DTO around southern New Hampshire and Lawrence, Massachusetts.  Physical

and electronic surveillance was conducted on the DTO via numerous surveillance detectives, as well as the GPS tracking device affixed to the gray 2013 Civic.

106.    At approximately 10:30 A.M., DELISON and BELISARIO were observed responding from Nashua to the intersection of Myrtle Street and Lawrence Street in Lawrence, Massachusetts.  Once there, the vehicle remained for approximately 30 minutes before travelling to the Registry of Motor Vehicles in Lawrence.  After this trip, the two returned to Nashua at approximately 12:30 P.M., and the gray 2013 Civic ultimately arrived at ███████.  At that time, DELISON was observed to enter the rear apartment of ███████ which is marked with a "7" adjacent to the door, TARGET APARTMENT 1, while BELISARIO was seen entering the east side entrance door which is marked with "14" "15" and "16," which investigators believe refers to Apartment 14, Apartment 15, and Apartment 16—TARGET APARTMENT 2.

107.    After approximately 10 minutes, BELISARIO and DELISON each exited their respective doors.  DELISON exited from his door to apartment 7 while BELISARIO exited from the east side door labeled "14, 15, 16".  BELISARIO left in the gray 2013 Civic and DELISON left in a green Toyota RAV4 bearing New Hampshire registration 5525293 ("the green RAV4") registered to ROUSEVER.  Surveillance was continued on BELISARIO, as he travelled alone to the area of 140 Daniel Webster Highway in Merrimack, New Hampshire, which is a Mobil gas station.  BELISARIO bypassed the gas pumps and convenience store and instead drove to the rear of the lot, where numerous other vehicles were parked.  BELISARIO was seen stopped for less than 30 seconds in the area of other cars before he left the area and headed back to Nashua.  This occurred at approximately 1:00 P.M.  Based on my training and experience, the brief 30-second stop at the rear lot of the gas station without purchasing gas or other items seemed

indicative of a street-level narcotics transaction. Due to numerous vehicles being in that area and surveillance members not wanting to be seen, BELISARIO's particular customer was not able to be identified. BELISARIO then returned back to Nashua where he responded to the gas station at 104 Canal Street in Nashua and filled his tank. This action furthered investigators suspicions that the Merrimack Gas station stop was a narcotics transaction, because BELISARIO passed all gas pumps and the convenience store to a secluded area before quickly exiting and later gassing up his car at a different location. BELISARIO returned back to ███████████ and entered the door on the east side of the structure labeled "14" "15" and "16."

108.    At approximately 1:25 P.M., BELISARIO exited ███████████ a short time before DELISON did. The two then travelled to the area of Atwood Court. BELISARIO was the driver of the gray 2013 Civic while DELISON was the sole passenger. Once on Atwood Court, DELISON exited the vehicle and was seen walking into a residence for approximately 30 seconds before the two exited the area. This behavior was also indicative of a street level narcotics transaction.

109.    The two then travelled towards the area of 10th Street. Once in that area, the gray 2013 Civic was observed meeting with a male who was on foot in the area. After quickly meeting with this male, DELISON and BELISARIO left the area and drove back to ███████ ███. This male whom the two met with quickly entered inside a residence on 10th Street prior to officers being able to stop him. This meeting was also indicative of a street level narcotics transaction.

110.    At approximately 2:33 P.M., DELISON and BELISARIO exited ███████████ together in the gray 2013 Civic. BELISARIO was seen exiting the building on the side entrance labeled "14" "15" and "16," while DELISON came out of his rear apartment door labeled "7"—

48

TARGET APARTMENT 1.  Once DELISON exited his apartment door, he then entered and

exited the laundry room which is a separate door in the rear of the building.  DELISON did this

without anything in his hands such as a clothing basket.  I believe it to be possible that

DELISON could also be keeping narcotics in this particular location.  Once DELISON exited the

laundry room the pair left in the gray 2013 Civic.  They then travelled to the area of Deer Run in

Hudson, New Hampshire, and stayed on that street for a matter of seconds before leaving the

neighborhood.  This particular residence is known to investigators as being occupied by a drug

customer of this DTO.  The two then travelled to the area of 107 Derry Street in Hudson, New

Hampshire, for a very brief stop as well.  This is also believed to be a regular customer of this

DTO.

111.    At approximately 4:15 P.M., DELISON was seen travelling to the area of Kehoe

Avenue and Marshall Street in Nashua.  DELISON met with a male who was waiting in the area

on foot.  After briefly meeting by the gray 2013 Civic, the male separated from DELISON and

quickly entered the apartment complex on Marshall Street.  Like the other meetings DELISON

had throughout the day, this was also indicative of a street level narcotics transaction.  DELISON

returned home to ████████████ at that time and entered his rear apartment door, believed to be

number "7," presumably carrying with him proceeds received from these transactions into

TARGET APARTMENT 1.

112.    At approximately 4:54 P.M., DELISON was observed to enter and exit the

laundry room for approximately 10 seconds without holding any clothing.  DELISON travelled

to the area of 57 Palm Street after this in the gray 2013 Civic. From my training and experience,

this particular address is known investigators to be the home address of narcotics users to include

the individual who was seen buying crack cocaine from DELISON on July 29, 2024.  After

remaining inside the location for approximately five minutes, DELISON left the area.

BELISARIO was inside the vehicle as a passenger during this particular stop. After this

occurred, the pair travelled to Market Basket in Nashua, at which time BELISARIO was seen

purchasing groceries before the two returned to ███████████. Once back, BELISARIO was

seen walking into the same door as before, on the east side of the building with the groceries,

while DELISON was seen entering his rear apartment door—TARGET APARTMENT 1.

***January 23, 2025 UC-4 controlled purchase of crack cocaine from RAYDDY
with assistance from DE JESUS CASTILLO as a lookout***

113.    On January 23, 2025, Detective Corey Gobbi acting in an undercover capacity

("UC-4") arranged for the purchase of crack cocaine from RAYDDY via the 4625 Phone. The

undercover purchase was arranged to occur in the area of Tyler Street in Nashua. Just prior to

the transaction taking place, numerous members of Nashua PD NID set up surveillance in the

area. Detective Matthew Foss was positioned in the area of Harbor Avenue when he observed

DE JESUS CASTILLO driving a brown Honda Civic bearing New Hampshire registration

5525305 ("the brown Civic") registered to RAYDDY. From Detective Foss's training and

experience, he noticed DE JESUS CASTILLO conducting counter surveillance for the upcoming

narcotics transaction between RAYDDY and UC-4. DE JESUS CASTILLO was following cars

around the area and also flashing his headlights believed to be in an effort to notify another

individual or vehicle in the area. DE JESUS CASTILLO positioned his vehicle in such a manner

so that he could observe UC-4 walking down Harbor Avenue towards Bowers Street, which was

the updated deal location. RAYDDY changed the meet location to an address on Bowers Street,

at which time DE JESUS CASTILLO was observed looking into vehicles in the area and even

following Detective Foss as he was monitoring UC-4's location. Once UC-4 was positioned on

Bowers Street, RAYDDY picked him up in a silver SUV with an unknown registration.

RAYDDY provided UC-4 with a quantity of crack cocaine in return for U.S. Currency before stopping and letting UC-4 out of the vehicle.  RAYDDY and DE JESUS CASTILLO both left the area at that time.  UC-4 was equipped with an audio-video recording device for this deal. The drugs seized during the deal were later tested by DEA laboratory which yielded a positive result of 11.932 grams of crack cocaine.

***January 27, 2025 surveillance of two DTO vehicles at 11-13 Merrill Street,***
***the building that encompasses 13 ½ Merrill Street—TARGET APARTMENT 3***

114.    On January 27, 2025, at approximately 1312 hours, Detective Foss was conducting surveillance in Nashua, New Hampshire.  While driving on Merrill Street, he observed two separate vehicles involved with this investigation.  He observed the brown Civic registered to RAYDDY, parked in the driveway of 11-13 Merrill Street.  Directly across from the same driveway, he observed the gray 2013 Civic bearing, which has often been driven by BELISARIO and RAYDDY.  While waiting in the area for a brief time, Detective Foss observed RAYDDY enter the gray 2013 Civic before driving away from the area of Merrill Street.

***Confirmation of the apartments associated with this DTO within***

115.    Between February 11 and February 12, 2025, I conducted extensive physical surveillance at               to confirm specific apartments which are being occupied by members of this DTO.  I was able to observe DELISON come and go from Apartment 7 numerous times.  I was also able to confirm ROUSEVER to come and go from Apartment 12, which is also on the east side of              on the first floor.  When doing so, ROUSEVER could be seen utilizing a key to access the apartment.  The green RAV4, which has been operated by ROUSEVER, is now registered in his name with a listed address of              , Apartment 12.

51

116.    I was also able to access the common hallway of the apartments on the second

floor via the door on the east side of ████████████ which BELISARIO, DELISON and

RAYDDY have been seen entering.  In an undercover capacity, I was able to knock on

Apartment 16, which is the one described by the cooperating defendant arrested on January 2,

2025, who described this particular apartment as belonging to this particular DTO.  BELISARO

answered the door and appeared to be alone in the apartment, confirming the evidence gathered

in this case that this is his residence.

***Confirmation of RAYDDY's residence at 13 ½ Merrill Street in Nashua,
TARGET APARTMENT 3.***

117.    Between January 27 and February 13, 2025, an extensive amount of physical

surveillance has been conducted on 13 Merrill Street in Nashua, New Hampshire, as RAYDDY's

2013 Honda Civic bearing New Hampshire registration 5525305 has been seen parking in the

driveway of the location regularly.  RAYDDY enters the residence through a door on the front

porch, which according to city of Nashua assessors' maps is 13 Merrill Street.  RAYDDY has

been seen removing mail from a mailbox on the right side of the front door which is labeled "13

½."

***February 13, 2025 UC-4 controlled purchase of crack cocaine from RAYDDY
after exiting 13 Merrill Street***

118.    On February 13, 2025, UC-4 arranged an undercover purchase of crack cocaine

from RAYDDY via the 4625 Phone.  The undercover purchase was arranged to occur in the area

of Bowers Street in Nashua.  Just prior to the transaction taking place, numerous members of the

Nashua PD NID set up surveillance in the area to include at RAYDDY's address of 13 ½ Merrill

Street in Nashua.  RAYDDY's Honda Civic bearing New Hampshire registration 5525305 was

parked in the front of the residence at that time.  RAYDDY left the front door of 13 ½ Merrill

Street and travelled alone directly to the intersection of New Street and Bowers Street in his

Honda Civic.  Once there, RAYDDY provided UC-3 with a quantity of crack cocaine in return

for U.S. currency before the two separated and RAYDDY left the area.

119.    Based on my training and experience, and given these observations, I believe that

the suspected crack cocaine delivered by RAYDDY was sourced from his residence at 13 ½

Merrill Street.  UC-4 was equipped with an audio-video recording device for this transaction.

The drugs were later field tested which yielded a positive result for the presence of cocaine.  Lab

test confirmation is pending.

***March 5, 2025 surveillance of RAYDDY***

120.    On March 5, 2025, surveillance was conducted on RAYDDY and his residence of

13 ½ Merrill Street in Nashua.  At approximately 5:25 P.M., RAYDDY was seen exiting the

door which leads into 13 ½ Merrill Street.  RAYDDY exited alone and then drove his Honda

Civic to the area of 300 Main Street in Nashua.  This particular area is a popular shopping plaza,

which has a large parking lot.  Detective Jowders and Detective Fitzpatrick assisted with

surveillance and observed RAYDDY drive into the parking lot and meet with another vehicle in

the lot.  After meeting together for a few seconds, the vehicles quickly separated.  Surveillance

members continued surveillance on RAYDDY, who then drove directly back to Merrill Street at

5:33 P.M., and walked into the door leading to 13 ½ Merrill Street.  RAYDDY did not make any

other stops before or after the suspected drug deal which occurred in the area.  These

observations were indicative of a narcotics transaction based on the investigators training and

experience as well as the extensive amount of surveillance conducted on this particular DTO.

***Information pertaining to TARGET APARTMENTS 1 and 2,***
***respectively,*** ▮▮▮▮▮▮▮ ***Apartments 7 and 16***

121.    TARGET APARTMENT 1 is a first-floor apartment located within ████ ████ in Nashua, New Hampshire.  The residential building at ██████████ is a multi-story, multi-unit apartment style building which is also attached to 35 Crown Street.  The building itself is a tan colored structure with white trimmed windows and brown front doors labeled with "35" and "37."  There are numerous exterior doors to access ██████████, however there is believed to be only one exterior door to TARGET APARTMENT 1, which is the apartment occupied by DELISON.  TARGET APARTMENT 1 is in the rear of the building with a number "7" affixed to a pole near the door.

122.    In addition to the static covert camera, I have personally conducted physical surveillance of ██████████ on many occasions since the DELISON DTO members were first observed living at this residence.  Almost every evening that I drove by this location, I observed vehicles affiliated with the DTO to be present at the location to include DELISON's Honda Civic, BELISARIO'S Honda Civic, and ROUSEVER's Toyota RAV4.   Investigators have observed RAYDDY coming from and returning to this location during controlled narcotics transactions.

123.    The rear apartment of ██████████ is believed to be Apartment 7 as there is a "7" affixed to a railing outside the door.  This apartment is utilized by DELISON as he is observed to be coming and going from this apartment routinely.  Furthermore, when conducting surveillance in the early morning and evening hours, DELISON can be seen being the last one to enter the apartment while also being the first one to exit the apartment in the morning.

124.    The laundry room is located next to apartment "7," also in the rear of ██████████.  This room appears to be a common area as the door does not look to lock when

DELISON is seen coming and going from that particular room. Laundry markings can be observed above this particular door.

125.    ROUSEVER's apartment has been identified as Apartment 12, as there is a "12" affixed to the exterior door which is on the east side of ███████████. This apartment is directly next to the door which BELISARIO accesses to gain entry to Apartment 16 which is on the second floor. This is also ROUSEVER's listed address with the New Hampshire Department of Motor Vehicles.

126.    TARGET APARTMENT 2 is BELISARIO's apartment and has been identified as Apartment "16" on the second floor of ███████████. There is a common, unlocked door on the left (east) side of ███████████ which is labeled with markings for "14" "15" and "16." After a follow-up visit within this building, on February 11, 2025, coupled with the information gathered from the cooperating defendant arrested on January 2, 2025, who described this particular apartment (16) as belonging to this particular DTO, I have also personally observed BELISARIO coming out of Apartment 16 at ███████████.

***Information pertaining to TARGET APARTMENT 3, RAYDDY's residence at 13 ½ Merrill Street in Nashua***

127.    TARGET APARTMENT 3 is RAYDDY's apartment and has been identified as 13 ½ Merrill Street, the first-floor apartment within 13 Merrill Street in Nashua, New Hampshire. 11-13 Merrill Street is a white multi-family residence on the south side of Merrill Street. There are two doors on the front of the residence with four mailboxes. Through research with the city of Nashua assessor's website and physical surveillance, this particular structure is believed to have 4 apartments: 11 Merrill Street, 11 ½ Merrill Street, 13 Merrill Street, and 13 ½ Merrill Street. The mailbox that RAYDDY was seen accessing on February 13, 2025 is the mailbox labeled 13 ½ Merrill Street, which is the second-floor apartment.

***Conclusions about the likely storage of narcotics, proceeds, and other implements of the drug trade within the TARGET APARTMENTS***

128.    During extensive surveillance efforts and controlled purchases, investigators have observed that the money from the narcotics sales was transported directly back to ███████ ███ on numerous occasions as outlined in this document.  Additionally, narcotics purchased and observations of narcotics being purchased have come directly from ██████████ and 13 ½ Merrill Street in Nashua, New Hampshire. This observation suggests that the TARGET APARTMENTS are also used as a safe repository for drug proceeds.  This observation is also consistent with other drug distribution operations that I have investigated, which involved the sale of narcotics sourced from a residence and the return of the money from those sales to the same residence for safe keeping.  I have also participated in many search warrant executions at premises believed to be "stash" locations, where large amounts of money have been seized.

129.    Based on the above observations and reasonable inferences, I believe that the DELISON DTO uses the TARGET APARTMENTS to store drugs for distribution and drug proceeds, in furtherance of a continuous and ongoing drug distribution operation, such that contraband associated with these activities is likely to be found within the TARGET APARTMENTS.  I further believe that other physical and personal items necessary for the DELISON DTO to communicate, coordinate, and ultimately advance said operation, to include electronic devices, constitute items of lasting utility to these individuals, such that those items are also likely to be kept within the TARGET APARTMENTS.

130.    This analysis is consistent with what I know through my training and experience, and with what I have encountered during similar narcotics investigations. Many drug dealers, who operate like the DELISON, BELISARIO, DE JESUS CASTILLO, NOVA RUIZ, and RAYDDY, store a large inventory of drugs within their homes and/or place of business.  Our

surveillance operations, and the reasonable inferences derived from related observations, indicate that drugs and drug proceeds are being stored inside the TARGET APARTMENTS. Thus, I believe that these individuals use the TARGET APARTMENTS to store narcotics for distribution and proceeds from narcotic transactions, among other implements of the drug trade.

131.    Based on the totality of the circumstances, the nature and scope of this long-term investigation, and the above-described drug transactions with the DELISON DTO, I submit there is probable cause to believe that the TARGET APARTMENTS are being used to store contraband or evidence, fruits, and instrumentalities of narcotic distribution, including items of lasting utility to the DTO (i.e. moneys derived from drug sales, cell phones and records or related billing documents, and records of drug transactions), in furtherance of a continuous and ongoing drug distribution operation, and that such evidence of drug distribution will be found in the target locations and on the individuals herein described.

***Use of premises, electronics in drug trafficking***

132.    Based upon my training, experience, and the training and experience of other agents that I have worked and spoken with, I am aware of certain relevant characteristics associated with drug trafficking.

133.    I am aware that drug traffickers often store drugs and items necessary for the manufacture of drugs in private places including in their residences, areas of curtilage, outbuildings such as sheds or trailers, vehicles, and in stash houses. I am aware that drug traffickers often possess and store firearms in their residences, their vehicles, and in stash houses to protect themselves, their supplies of drugs, and/or drug proceeds.

134.    I am aware that drug traffickers must maintain, on-hand, large amounts of U.S. Currency to financially sustain their on-going narcotics business.

135.    I am aware that individuals involved in narcotics trafficking often maintain records linking them to their trafficking activity and their drug trafficking associates. These records may be stored physically or digitally on computers or other electronic devices or media. These records may include notes, records or ledgers of narcotics sales, debts owed, past or future shipments, and other records, including telephone records, which identify customers and/or other co-conspirators. Through my training and experience, I know that such records may be in code and/or may appear as rather innocuous and not particularly incriminating on their face. Such records are often maintained by drug traffickers for extended periods of time. The aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them including on electronic devices and/or stored in their residences and their vehicles.

136.    I am aware that it is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses, their vehicles, stash houses, and/or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities.

137.    I am aware that drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. Even though these assets are in the names of others, the drug traffickers actually own and use these assets, and exercise dominion and control over them.

138.    I am aware that it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as: currency, financial instruments, precious metals and gemstones, electronics, jewelry, books, records, invoices, receipts, records of real estate transactions, bank

statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers' checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the drug traffickers within their residences, businesses, vehicles or other locations which they maintain dominion and control over.

139.    I am aware that when drug traffickers amass significant proceeds from the sale of drugs, they often attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, among other mechanisms, domestic and international banks and their attendant accounts, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency. Drug traffickers often commingle narcotics proceeds with money generated by legitimate businesses.

140.    I am aware that drug traffickers commonly maintain books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization.

141.    I know through my training and experience that drug traffickers commonly carry and use more than one cell phone to conduct their drug trafficking business.  Specifically, I know that drug traffickers will commonly carry at least one phone to communicate with customers and at least one other phone to communicate with co-conspirators and suppliers.  I know that drug traffickers will often insulate their customer phone from any other devices that they utilize, as the customer telephone is inherently the riskiest part of the operation.

142.    Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments.

143.    Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items can be stored on cell phones.

144.    Cellular telephones often contain evidence of drug crimes, such as internet searches for drug-related paraphernalia, addresses and/or telephone numbers of suppliers and customers, as well as incriminating communications via emails, text messages, and/or instant messages. Most cell phones are now capable of performing internet searches and also allow the user to send and receive emails and text messages.  Based on my training and experience, I am aware that drug traffickers may use encrypted chat platforms, such as Whatsapp, Textnow, Signal, Facebook Messenger, and Instagram, to communicate with individuals in other countries (often countries that supply controlled substances to the United States) and with individuals who are cautious about law enforcement detection.

145.    In addition, applications such as Venmo and Cash App allow people to conduct financial transfers quickly and easily using their cellular telephones, and drug customers may use these methods to pay their sources of supply for drugs.

146.    As noted above, drug traffickers commonly communicate using multiple cellular telephones. The numbers assigned to and dialed by particular cellular telephones can themselves be evidence of drug trafficking. Such numbers can confirm the identities of particular speakers and the occurrence of certain events.

147.    Based on my training, experience, and information provided by other law enforcement officers, I am aware that many cellular telephones now function essentially as small computers. Such telephones, known as smartphones, have capabilities that include – in addition to those noted above – serving as a digital camera, portable media player, and GPS navigation

device, and they allow for the storage of a vast range and amount of electronic data. Examining

data stored on devices of this type can uncover, among other things, evidence that reveals or

suggests who possessed or used the device.

148.    Thus, I submit that the totality of the circumstances present in this case and my

conclusions drawn therefrom establish probable cause to believe that evidence of distribution and

possession with intent to distribute controlled substances, and conspiracy to distribute and

possess with intent to distribute controlled substances, in violation of Title 21, United States

Code, Sections 841 and 846 will be found within cellular telephones which may be located

within the premises or on the persons identified to be searched.

Respectfully submitted,

/s/ Ryan McDermott
Detective Ryan McDermott
Task Force Officer
Drug Enforcement Administration

The affiant appeared before me by telephonic conference, on this date, pursuant to Fed. R. Crim.
P. 4.1, and affirmed under oath the content of this affidavit and application.

Date:   Mar 12, 2025

ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

Time:   6:17PM, Mar 12, 2025

## ATTACHMENT A-3
### (PREMISES TO BE SEARCHED)

TARGET APARTMENT 3 is a second-floor residential unit designated as "13 ½" within a residential building structure located at 11-13 Merrill Street, Nashua, New Hampshire. According to the property card data available with the city of Nashua's assessor's office, the property at 11-13 Merrill Street contains 0.116 acres of land and a family flat-style residential building structure with a vinyl exterior, two floors, and four residential units designated as "11," "11 ½," "13," and "13 ½." The property and residential building are depicted below in Image 1.1 and Image 1.2, and, for ease of reference, the four sides of the property and residential building are labeled with the numbers 1, 2, 3, 4. Side 1 is the front of the building that faces Merrill Street.

**Overhead View of the Property and Residential Building at
11-13 Merrill Street, Nashua, New Hampshire**

| Image 1.1 | Image 1.2 |
|---|---|
| (Source: City of Nashua Assessor) | (Source: Google Maps) |




Through physical surveillance of 11-13 Merrill Street, law enforcement agents have also observed that the residential building is a white color structure with white trim windows, two dark color front doors, and four mailboxes: two on either side of each door, indicating four separate mailing addresses and residential units.  Side 1 or the front of the residential building is depicted below in Image 1.3 with a red arrow pointing left to the front and main exterior door to access unit "13" on the first floor and unit "13 ½" on the second floor.  This front exterior door is used to access a common hallway and reach a second-floor interior door to access TARGET APARTMENT 3.

**Frontal View of the Residential Building at
11-13 Merrill Street, Nashua, New Hampshire**

**Image 1.3
(Source:  Google Maps)**



**ATTACHMENT B-3**
(ITEMS TO BE SEIZED AND SEARCHED)

1.      The items to be searched for and seized are the following:  All items that
constitute contraband and evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841
(distribution and possession with intent to distribute controlled substances) and 21 U.S.C. § 846
(conspiracy to distribute and possess with intent to distribute controlled substances), including:

        a.      Cocaine, crack cocaine, and other controlled substances;

        b.      Drug paraphernalia, including, chemical dilutants, weighing scales, and
items utilized in the manufacture, sale or other distribution of controlled substances;

        c.      U.S. Currency, or any and all monetary instruments, or other items of
value used in, or intended for use in, or derived from the manufacture, sale or other
distribution of controlled substances;

        d.      Any and all documents, records or information associated with the
manufacture, sale or other distribution of controlled substances, including pay-owe
sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales,
and records of expenditures made to purchase controlled substances;

        e.      Books, records, receipts, notes, and ledgers relating to the ordering,
receipt, possession, transportation, purchasing, shipment, tracking, delivery and
distribution of controlled substances;

        f.      Papers and records relating to names, addresses, and telephone numbers
relating to co-conspirators, sources of drug supply, and drug customers;

        g.      Indicia of occupancy, residency, and ownership or use of the subject
premises, including, but not limited to, utility and telephone bills, cancelled envelopes,
rental, purchase or lease agreements, identification documents and keys; and